## WALLACE v. CARGO OF 292,000 FEET OF PINE BOARDS.

(District Court, E. D. New York. June 18, 1915.)

1. ACCORD AND SATISFACTION ⊚⟶11—DEMURRAGE—ACCEPTANCE OF CHECK FOR FREIGHT.

The acceptance of a check in full for "freight" due under a charter *held* not an accord and satisfaction of an additional claim for demurrage.

[Ed. Note.—For other cases, see Accord and Satisfaction, Cent. Dig. §§ 75–82; Dec. Dig. ⊚⟶11.]

2. SHIPPING ⊚⟶181—DEMURRAGE—COMPUTATION OF LAY DAYS.

Under a charter party requiring discharge of a cargo of lumber at the rate of 35,000 feet per day, without any exception, Sundays are to be excluded from the lay days allowed, but included in the time for which demurrage may be claimed after the lay days have expired.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 589–592; Dec. Dig. ⊚⟶181.]

In Admiralty. Suit by Nelson A. Wallace, master and part owner of the schooner Charles L. Jeffrey, against a Cargo of 292,000 Feet of Pine Boards. Decree for libelant.

Alexander & Ash and Peter Alexander, all of New York City, for libelant.

Conway, Williams & Kelly and D. T. Kelly, all of New York City, for claimant of cargo.

CHATFIELD, District Judge. This action is for demurrage. It is not disputed that the schooner arrived on the evening of November 9th and that the captain reported in New York harbor to the consignees during the day of Tuesday, November 10, 1914. During that same day he proceeded with the schooner to her berth in Whale creek, by 1 o'clock p. m. on Wednesday, November 11th, was ready to discharge, and at that hour received the permit, which was then filed in the office of the lumber company, and unloading began. This berth was at a city public wharf, where the unloading was under the direction of the city authorities. In ordinary course the cargo had to be removed as fast as unloaded, and could not be piled upon the wharf. The charter party had been made in Boston on the 13th of October, 1914, and provided for the carrying of a cargo of dry pine boards from Liverpool, Nova Scotia, to New York by the schooner Charles L. Jeffrey. The boat was chartered by her captain to Harrigan & Streeter, of Boston, who agreed to pay for the *use* of said vessel "$3.50 per M freight," payable in cash one-half on arrival and the balance on discharge.

"It is agreed that the lay days for loading and discharging shall be as follows: Commencing from the time the vessel is ready to receive or discharge cargo. Cargo to be delivered to the vessel at the rate of 35 M per day and be received from the vessel at the rate of 35 M per day in New York." "Detention" at the rate of $30 per day to be paid by the party of the second part, or agent.

It appears that the cargo was taken over the rail of the schooner onto small trucks, that the unloading did not proceed at the rate of 35 M per day, and that the crew of six men were not fully occupied during

several days at the beginning of the unloading. The agent of Harrigan & Streeter called at the dock and endeavored to hurry the unloading with the company receiving and using the lumber. The unloading proceeded from 1 o'clock on the 11th and upon the 12th, 13th, and 14th. On Sunday no work was done. Work proceeded again on the 16th, 17th, and 18th. On the 19th work stopped early in the day, the captain making a record of three hours' time spent unloading, when, the surveyor stopping, the work ceased because of hard rain. Work went on again on the 20th and the 21st, and again stopped on Sunday. On Monday, November 23d, the lumber was discharged; the work being completed by 5 o'clock p. m. It also appears that on the 21st and 23d some 120,000 feet of lumber was taken from the boat. It appears that the charter was made in the particular form used to remove any question as to the customs in New York harbor. But this has nothing to do with the determination of the case; it merely makes definite the situation under which the charter was drawn.

The libelant brings his case under a strict construction and interpretation of the charter party with respect to the provisions as to lay days. The respondent presents evidence to show that upon Tuesday, November 24th, the next morning after the unloading was completed, the captain of the vessel communicated with the consignee's agent, and that some discussion was had during the day with respect to the captain's claim for demurrage. It would appear that he left town that afternoon, and that the same evening, in a telephone conversation with the steamship brokers, a request was made upon the agent of the consignee for payment of the freight due for the voyage. Upon request for an itemized bill, a statement was rendered by messenger as follows:

New York, Nov. 24, 1914.

Mess. Harrigan & Streeter, or Hamlin Lumber Co., to Gilmartin & Trundy, Dr.

Str. Charles L. Jeffrey.

To water freight on cargo of lumber, 292,391 ft. at $3.50
per M.........................................................$1,023.37
Less amount of draft for cash and insurance..............   60.45

                                                          $962.92
Less 5 per cent. customary insurance and brokerage charge
on amt. advanced......................................       3.02

Balance ...........................................        $959.90

A check for $900 was sent on account, and upon the 30th of November a check for $59.90 for the balance was sent and the bill receipted. The check bore upon the back an indorsement that it was "in full for all freight, schooner Charles Jeffrey." This was received and put through the bank, indorsed for payment in that form. The charter party provides for the hire of the vessel during the voyage, and calls that compensation "freight." It provides that for *detention* $30 per day shall be paid.

[1] The libelant therefore contends that the acceptance of payment in full for "freight" left open the amount sued for as demurrage, and the phrase, that "a commission of 5 per cent. on the gross amount of this charter, demurrage, and any renewals of the same is due," would

indicate that the two payments were not a part of the charge for freight. The next sentence, calling for payment of this commission *in advance* when the commission would be computed upon the amount of demurrage, if any should be incurred, was impossible of complete fulfillment. Under ordinary circumstances the court would presume that both the charges for hire and for demurrage would be included in the ordinary interpretation of such a charter in the term "freight." But in the present case, where the consignee's agent was dealing with the owner and with the brokers separately, where the charter is ambiguous, and where the testimony shows so clearly that the word "freight" was used by the broker as distinct from the claim for demurrage, which was discussed and presented by the master, it is impossible to hold that the acceptance of the check for freight is an estoppel or an accord and satisfaction of the entire claim.

[2] So that we will consider the time consumed in unloading the vessel. The parties having made a definite charter, and having left out of consideration any rules prevailing in the harbor of New York, and each party standing strictly upon the charter, it must be assumed that, if the vessel was ready for discharge at 1 o'clock p. m. upon the day after her arrival and reporting, the time would begin at that hour on November 11th, and the testimony indicates that delivery did begin at that time. The language of the charter party is that lay days are to commence from the time the vessel is ready to discharge cargo, and that cargo is to be received at the rate of 35 M per day in New York. Under the laws governing the interpretation of contracts, as well as the statutory regulations of conduct, the absence of any exception or provision for work caused by necessity would lead us to assume that the statute of the state, treating Sunday as a day not to be devoted to work, would be considered implied, even in a contract as strict as the one in question. Therefore the first Sunday, or the Sunday within the lay days, must be excluded. The time lost upon a rainy day would, however, come within a period which was being estimated from the rate of discharge at "35 M per day." The fraction left by dividing 292,391 feet by "35 M" is substantially near enough to 8½ to give the consignee at the charter rate of discharge until the evening of Friday, November 20th.

Detention for which demurrage is to be given is to be measured by time, rather than working days; hence the libelant is entitled to collect from Friday evening until Monday evening, or 3 days.

The libelant may have a decree for $90 and costs.