## ELVERS et al. v. W. R. GRACE & CO.

(Circuit Court of Appeals, Ninth Circuit. August 20, 1917.)

No. 2750.

1. SHIPPING ☜185—CHARTERS—DEMURRAGE—LIEN ON CARGO.

The reciprocal lien between ship and cargo arises only after the cargo is on board, and in the absence of contract therefor there is no maritime lien on the cargo for demurrage incurred by a charterer in the loading.

2. SHIPPING ☜173—CONSTRUCTION OF CHARTER PARTY—CESSER CLAUSE.

No liability is destroyed by the cesser clause of a charter party, unless it is re-created in some one else by the lien clause.

3. SHIPPING ☜173—CONSTRUCTION OF CHARTER PARTY—CESSER CLAUSE.

The lien and cesser clause of a charter party followed provisions fixing the lay days for loading and discharging and the amount of demurrage to be paid by the charterer for the excess of time consumed, and provided that "vessel to have a lien on cargo for all freight, dead freight, and demurrage, it being understood that all and any liability of the charterers under this agreement shall cease and determine as soon as the cargo is on board; all questions, whether of demurrage or otherwise to be settled with the consignees, the owners and captain looking to their lien on the cargo for this purpose." *Held,* that such clause left it doubtful whether the lien given extended to an antecedent liability of the charterers for demurrage in loading, or applied only to future liabilities, and should therefore be construed as not exempting the charterers from such liability.

Appeal from the District Court of the United States for the First Division of the Northern District of California; Maurice T. Dooling, Judge.

Suit in admiralty by Martin H. A. Elvers and Frederick A. E. Zimmer, owners of the ship Schwarzenbek, against W. R. Grace & Co., a corporation. Decree for respondent on exceptions to libel, and libelants appeal. Reversed.

For opinion below, see 231 Fed. 361.

Libelants are engaged in business in the city of Hamburg, Germany, as copartners under the firm name and style of Knohr & Burchard, Nfl., and are the owners of the steel ship Schwarzenbek. The respondent is a corporation organized and existing under the laws of the state of Connecticut, and doing business in the city of San Francisco, in the Northern district of California. On August 16, 1906, Knohr & Burchard, Nfl., in the city of London, England, chartered the Schwarzenbek to respondent to carry a cargo of sawn lumber from a mill or loading place on Puget Sound, or in British Columbia not north of Burrard's Inlet, as might be directed by charterers, to Callao, under a charter party containing, among others, the following provisions:

"Orders as to loading mill to be given within 48 hours, Sundays and legal holidays excepted, after notification to charterers or their agents in San Francisco of arrival of vessel at Port Angeles, Port Townsend, or Royal Roads, failing which lay days to count."

Charterers "shall be allowed for the loading and discharging of said vessel at the respective ports aforesaid, lay days as follows: Thirty (30) working lay days for loading, not to commence before 1st Feby., 1907, unless with charterer's consent, to commence 24 hours after vessel is at loading place satisfactory to charterers, inward cargo and/or unnecessary ballast discharged and ready to receive cargo; master having given written notice to that effect. Discharge to be given with dispatch according to the custom of the port of discharge at such safe wharf, dock, or place as charterers may direct, but

at not less than 35,000 feet B. M. per day. For each and every day's detention by the fault of party of the second part [charterer] or agents, they agree to pay to the said party of the first part [owners] demurrage at the rate of three pence sterling per register ton per day."

"Cargo to be stowed under the master's supervision and direction; charterers' stevedore to be employed at not exceeding $1.10."

"Vessel to have a lien on cargo for all freight, dead freight, and demurrage, it being understood that all and any liability of the charterers under this agreement shall cease and determine as soon as the cargo is on board; all questions, whether of demurrage or otherwise, to be settled with the consignees, the owners and captain looking to their lien on the cargo for this purpose."

It is alleged in the amended libel for demurrage, filed June 11, 1914, that on or about March 2, 1907, the Schwarzenbek arrived at Royal Roads, one of the loading places mentioned in said charter, and her master gave notice to respondent charterers of her arrival thereat, which notice was received by said respondent charterers at the hour of 4:30 p. m. on March 4, 1907; that on March 6, 1907, at 5:45 p. m., said respondent charterers, in response to said notice of said master, wired the master of said ship as follows: "We will load your ship millside;" that said wire did not designate or direct to which millside said vessel should proceed, nor at what time said vessel should proceed thereto; that thereafter said master wired said respondent charterers a second time, and thereafter, on March 7, 1907, received the following wire from said respondent charterers, to wit, "Millside Fraser river;" that said ship then proceeded to the designated loading place, and, with her inward cargo and/or unnecessary ballast completely discharged, was ready to receive her cargo; that her master gave written notice of said facts and said readiness on March 13, 1907; that notwithstanding the performance by the libelants of all of the conditions of said contract of charter party, and notwithstanding there was no remissness nor fault on the part of said libelants, the respondent, by its own default, did not load the said ship within the 30 working lay days in said charter party agreed upon, but, contrary to the terms of said charter party, respondent delayed said ship until May 15, 1907; that libelants, by the acts and defaults of respondent, became entitled to demand from respondent demurrage for 33 days at the rate of 3 pence per registered ton per day; that on or about May 15, 1907, the master of said ship, on the demand of charterers, but reserving the rights and claims of libelants on account of respondent's breach of the charter party as aforesaid by duly made protest, issued bills of lading to said charterers, wherein and whereby said respondent or assigns were mentioned as consignees of said cargo, but which bills of lading contained no reference to the demurrage previously incurred; that said bills of lading are in the possession or under the control of respondent, and out of the possession and control of libelants, and libelants pray for their production by respondent; that notwithstanding respondent has been requested to pay the sum of $3,762.91, the demurrage aforesaid, respondent has refused and still refuses to pay the same or any part thereof, and libelants pray judgment for such demurrage and costs.

Respondent filed its exceptions to the amended libel on July 1, 1914, alleging that the amended libel did not state a cause of action against respondent. The court filed a written opinion (Elvers v. W. R. Grace & Co. [D. C.] 231 Fed. 361), sustaining the exceptions and dismissing the libel, and entered a decree accordingly. Libelants appeal from this decree.

Andros & Hengstler, Louis T. Hengstler, and Golden W. Bell, all of San Francisco, Cal., for appellants.

Nathan H. Frank and Irving H. Frank, both of San Francisco, Cal., for appellee.

Before GILBERT, MORROW, and HUNT, Circuit Judges.

MORROW, Circuit Judge (after stating the facts as above). There is but one question for review by this court, namely: Does the amend-

ed libel state a cause of action against the respondent (appellee)? The determination of that question rests upon the construction of the charter party signed by the parties, with particular reference to the effect to be given to the lien and cesser clause therein contained.

The charter party specifically states the number of lay days which shall be allowed to the charterers for loading of the vessel, and the conditions for discharge of cargo, and then follows the agreement by the charterer, absolute in form, to pay to the shipowner demurrage at the rate of three pence sterling per register ton per day for each and every day's detention of the vessel by the fault of the charterer. The libelants here seek to recover under the liability thus created, but the respondent claims it is absolved from that liability by the lien and cesser clause later appearing in the charter, and that the libelants, not having availed themselves of the privilege afforded by the lien clause, cannot maintain the present libel against the respondent. The lien and cesser clause provides:

"Vessel to have a lien on cargo, for all freight, dead freight, and demurrage, it being understood that all and any liability of the charterers under this agreement shall cease and determine as soon as the cargo is on board; all questions, whether of demurrage or otherwise, to be settled with the consignees, the owners and captain looking to their lien on the cargo for this purpose."

In Scrutton on Charter Parties and Bills of Lading (6th Ed.) the scope and purpose of this lien and cesser clause is explained as follows:

"This clause, known as the 'lien and exemption clause,' or 'cesser clause,' is usually inserted in consideration of the granting the shipowner of a lien which he would not otherwise possess on the cargo for demurrage and dead freight." Article 53, p. 137.

[1] There is no question concerning dead freight in this case. The only subject we have to deal with is demurrage for delay in loading the vessel. There is no maritime or common-law lien for demurrage prior to loading. The reciprocal relation of the ship to the cargo and the cargo to the ship, whereby the ship is bound to the cargo and the cargo to the ship, is not established until the cargo is on board. After the cargo is loaded on the vessel there is, under the maritime law, a lien on the cargo for demurrage which will then necessarily be incurred only in its discharge. 36 Cyc. 371; The Hyperion's Cargo, 2 Lowell, 93, 12 Fed. Cas. No. 6,987, affirmed in Donaldson v. McDowell, 7 Fed. Cas. No. 3,985; Two Hundred and Seventy-Five Tons Phosphates (D. C.) 9 Fed. 209; Hawgood v. One Thousand Three Hundred and Ten Tons of Coal (D. C.) 21 Fed. 681; Davis v. Smokeless Fuel Co., 196 Fed. 753, 116 C. C. A. 381. Prior to the loading the shipowner has a right of action against the charterer upon his specific agreement to pay demurrage as provided in the charter party.

[2] The appellee contends that by the cesser clause the shipowners in this case surrendered their right to enforce this liability against the charterers, and accepted in lieu thereof a lien on the cargo. In Crossman v. Burrill, 179 U. S. 100, 107, 21 Sup. Ct. 38, 45 L. Ed. 106, the Supreme Court stated that the true rule of construction of the cesser

clause had been settled by a series of English decisions in which that excellent commercial lawyer, Lord Esher, then lately Master of the Rolls, took a leading part, and that it was well summed up with the reasons supporting it by himself and other judges in two cases in the Court of Appeal, viz.: Clink v. Radford, [1891] 1 Q. B. 625, and Hansen v. Harrold, [1894] 1 Q. B. 612. In Clink v. Radford Lord Esher said:

"In my opinion the main rule to be derived from the cases as to the interpretation of the cesser clause in a charter party, is that the court will construe it as inapplicable to the particular breach complained of, if by construing it otherwise the shipowner would be left unprotected in respect of that particular breach, unless the cesser clause is expressed in terms that prohibit such a conclusion. In other words, it cannot be assumed that the shipowner without any mercantile reason would give up by the cesser clause rights which he had stipulated for in another part of the contract."

In Hansen v. Harrold, Lord Esher said:

"Where the provision for cesser of liability is accompanied by the stipulation as to lien, then the cesser of liability is not to apply in so far as the lien, which by the charter party the charterers are able to create, is not equivalent to the liability of the charterers."

In the Laws of England, compiled by the Earl of Halsbury (volume 26, p. 133), there is a very full statement and citation of the English authorities upon this subject, as follows:

"A charter party usually contains a stipulation, known as a cesser clause, providing that the charterer's liability under the charter party is to cease as soon as the cargo is shipped. Such a stipulation is valid, but its effect varies according to the language in which it is framed. Whatever form the stipulation may take, the exemption as regards future liabilities arising after the loading appears to be absolute. As regards antecedent liabilities, the cesser of liability depends upon the wording of the clause. The clause may expressly deal with such liabilities; it may provide that the liability in respect of them is to continue or to cease, either absolutely or conditionally upon their discharge. More usually there is no express reference to antecedent liabilities, and the extent of the exemption then depends upon the construction to be placed upon the particular stipulation employed. If it is clear from the words of the stipulation that all liabilities under the charter party, antecedent as well as future, are to cease on loading, the exemption is equally absolute in the case of antecedent liabilities as in the case of future liabilities. If, on the other hand, the words used are open to a different interpretation, the charterer's liability as to antecedent breaches of the charter party will cease only in so far as an equivalent is given to the shipowner in the shape of a remedy available against the consignee. The cesser clause will therefore be construed as inapplicable to the particular breach complained of, if the effect of a different construction would be to leave the shipowner unprotected in respect of that particular breach. To ascertain the extent of the protection conferred by a cesser clause, the lien clause which follows it and which embodies the remedy given to the shipowner as the corollary of the charterer's release must be read with it, and the two clauses must, if possible, be taken as coextensive. No liability is destroyed by the cesser clause, unless it is re-created in some one else by the lien clause. The construction of the cesser clause is therefore governed by the construction of the lien clause, and if that clause confers no lien on the shipowner in respect of the claim which is in question, the charterer's liability is not taken away by the cesser clause. Accordingly the cesser clause usually provides that it is not to take effect unless the cargo shipped is sufficient to satisfy the various liens which the shipowner may possess over the cargo."

[3] Turning now to the cesser clause under consideration, we find that it is not clear that all liability under the charter party, antecedent as well as future, is to cease on loading. Similar clauses expressed in such ambiguous language have been held by the courts as not exempting a charterer from responsibility for delay occurring prior to loading. 36 Cyc. 352; Pederson v. Lotinga, 28 L. T. 267, 5 W. R. 290. In Christofferson v. Hansen, L. R. 7 Q. B. 500, Lord Chief Justice Cockburn, referring to a similar clause in a charter party, said, "The language is to a certain extent ambiguous;" and, stating the two constructions that might be placed upon the clause, he mentioned them as one relieving the charterer from all liability both before and after loading, and the other relieving the charterer from only such breaches as might occur after loading. The court adopted the latter construction, Mr. Justice Blackburn saying:

"If persons wish and intend to get rid of all liability, past as well as future, they can very easily do so by expressing themselves in unambiguous language."

In Schmidt v. Keyser, 88 Fed. 799, 32 C. C. A. 121, the Circuit Court of Appeals followed the last-mentioned case in holding that:

"Where the charter party provided that all liability on the part of the charterer should 'cease as soon as he shipped the cargo,' * * * the clause applied only to liability accruing after the loading, and did not relieve the charterer from liability accruing before the completion of the loading."

It comes, then, to this: If we find the meaning of the clause not clear, but doubtful, that, in and of itself, is a sufficient reason why we should not construe it as relieving the charterer from his stipulated liability for breaches prior to loading. Then if, upon examining the terms of the clause, we find that it provides for a surrender of the right of action against the charterers for liability for demurrage antecedent to loading, and no equivalent remedy is given the shipowners available against the consignees; that the liability destroyed by the cesser clause is not re-created in some one else by the lien clause; that it confers no lien on the shipowners with respect to the antecedent liability of the charterers, and therefore leaves the shipowners unprotected in respect to that particular breach; and that the lien conferred is not commensurate with the liability of the charterers under the general terms of the charter party; and we find further that the shipowners will have surrendered the antecedent liability of the charterers without any consideration, since the lien given the shipowners on the cargo after loading is one they had before, we must conclude that the charterers are not relieved from their antecedent liability prior to loading, and as a consequence the libel in this case stated a cause of action, and the demurrer should have been overruled.

The judgment is accordingly reversed, with direction to overrule the demurrer, and that such further proceedings be had as are not inconsistent with this opinion.