## W. R. GRACE & CO. et al. v. HANSEN.

## THE H. C. HANSEN.

(Circuit Court of Appeals, Ninth Circuit. September 7, 1920. On Rehearing, May 16, 1921.)

No. 3413.

1. **Shipping ⬅181—Charter held to require furnishing of deck as well as under-deck cargo during lay days.**

Where the charter in a separate paragraph authorized loading a deck cargo so as not to endanger the rest of the cargo, and provided for delivery to the ship at a daily rate which would have supplied the ship with both under-deck and deck cargo within the specified lay days, the lay days were given for the loading of the entire cargo, so that demurrage is recoverable after the expiration thereof, though, during that time, the master did not notify the charterer of his intention to load the deck cargo.

2. **Shipping ⬅178—Delay in loading cargo held fault of charterer.**

Where the charter required the owner to employ charterers' stevedore, and gave the master control only of the stowage, the charterer, not the vessel, is liable for demurrage for delay in loading caused by the stevedore's employment of only one shift.

3. **Shipping ⬅178—Delay of charterer in furnishing cargo held not excepted by strike clause.**

Where the charterer's mills were closed on account of strikes before the vessel was ready to load, but had resumed operations before that time, and were cutting sufficient lumber to load the vessel, but it was not delivered to the vessel, because binding orders for such delivery had not been given in time, the charterer is not exempted from payment of demurrage for the delay under the clause excepting liability for loss due to strikes.

4. **Shipping ⬅178—Strike clause in charter does not apply to manufacture of cargo.**

A charter provision exempting delays from strikes connected with the working, delivery, or shipment of the cargo does not except the charterer from liability for delays caused by strikes in the mills manufacturing the lumber for the cargo.

5. **Shipping ⬅175—"Demurrage" in charter held to apply to unexcused delay after lay days.**

Where the parties to a charter intended that the voyage must be begun at the end of the time required to load the ship, and fixed a demurrage charge against the party responsible for each day's delay, subject to exceptions contained in the contract, demurrage is not to be construed in its strict legal sense, but provides for payment for all detention beyond the time set for the loading not excused under the contract.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Demurrage.]

6. **Shipping ⬅175—Delay to procure notation of demurrage claim does not entitle to further demurrage.**

The lien and cesser clause of a charter does not preclude the shipowner's right of action in personam against the charterer to enforce his

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

claim for demurrage, so that the ship is not entitled to demurrage for the time during which the master was endeavoring to procure bills of lading with notation of claims for demurrage thereon, especially where he could have instituted proceedings and secured bonds to release from attachment during the time the vessel was detained for repairs after the cargo was loaded.

**7. Shipping ⊙=175—Charterer held entitled to demurrage for delay during repairs to windlass.**

Where the vessel was detained, after the cargo was loaded, for repairs to the windlass, without which the underwriters would not have allowed the voyage to proceed, the charterer is entitled to the stipulated demurrage during the time of such repairs, which were necessary to make the vessel seaworthy as required by the charter.

**8. Shipping ⊙=181—Notice of readiness to load held sufficient.**

Where the charter required 72 hours' notice to the charterer of the readiness of the vessel to load, and notice of readiness was given 2 days after the arrival of the ship, and loading commenced 3 days after such notice, the notice was sufficient to start the lay days running from the day loading commenced.

**9. Shipping ⊙=180—Charterer entitled to deduct from demurrage for time loading was delayed by ship's fault.**

A charterer is entitled to a deduction from the demurrage charged against him for half day's time during which loading was prevented by an accident to the ship's donkey engine.

**10. Shipping ⊙=178—Demurrage allowed for day when stevedore decided insufficient quantity was on hand.**

Where none of the cargo was loaded on a ship during a certain day because the stevedore decided there was less than a half day's work ready for loading, and that it would not pay to bring his men for such quantity, the ship is entitled to demurrage under the charter for that day's delay.

**11. Shipping ⊙=175—Demurrage not allowed for delay in sailing after loading was completed.**

A shipowner is not entitled to demurrage for 3 days during which the vessel did not sail after the cargo was loaded, and the demurrage controversy disposed of by the filing of the libel and the furnishing of a release bond.

On Rehearing.

**12. Shipping ⊙=175—Charter held to authorize charterers to select size of lumber for cargo.**

A charter party for a vessel to carry a cargo of lumber, in which the charterers agreed to furnish the vessel a full cargo of lumber or timber of such lengths and sizes as could be taken from the vessel's hatchways, the vessel to have the privilege of loading a deck load, authorizes the charterers to select the sizes and dimensions of the lumber to be loaded, subject to the limitations with relation to the hatchways of the ship.

**13. Shipping ⊙=181—Charter held to allow 10 lay days for loading.**

In a charter party requiring the charterer to furnish a full cargo of lumber, which the evidence showed was estimated to be not less than 1½ million feet, and allowing for the loading of the cargo 150,000 feet per working day, the charterer was given 10 lay days for loading the full cargo, but was not required to load the specified quantity of lumber each day.

**14. Shipping ⊙=184—Evidence held to sustain findings charterers' stevedore loaded cargo.**

On a libel for demurrage, pending the loading of a cargo of lumber, evidence *held* to sustain the finding that the stevedore who loaded the lumber was employed by the charterer, not by the ship, though he testi-

⊙=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

fied he took orders as to the stowage from the master, who was given authority to direct the stowage by the charter party.

15. **Shipping** ☞175—**Whether charterer or ship employed stevedore held not to affect question of. delay.**

Where the charter party obliged a charterer to furnish the full cargo of lumber at a specified rate per day, and it failed to do so it is immaterial, in determining the demurrage to which the ship is entitled whether the charterer or the ship employed the stevedore.

16. **Shipping** ☞175—**Charterer allowed demurrage during time ship waited for settlement of demurrage claim.**

Where a ship delayed sailing after she was fully loaded for 4 days, during which time the master was endeavoring to secure a notation of demurrage on the bill of lading, which the charterer refused, and was libeling the cargo to secure the demurrage, which could have been done on the first day, the charterer is entitled to the demurrage specified in charter party for those 4 days.

Appeal from the District Court of the United States for the Northern Division of the Western District of Washington; Jeremiah Neterer, Judge.

Libel by Capt. I. P. Hansen, on behalf of the owners of the motorship H. C. Hansen, against 1,523,000 feet of lumber loaded on board the motorship H. C. Hansen, of which W. R. Grace & Co. were claimants. Decree allowing libelant demurrage claimed, less a deduction for demurrage during the period the ship was being repaired, and both parties appeal. Decree modified and affirmed.

This is an appeal by Grace & Co., claimants and cross-libelants in the District Court, and a, cross-appeal by Hansen, libelant in the lower court, awarding demurrage to both parties. On June 12, 1917, Hansen, owner of the motorship Hansen, then under construction, chartered the ship to Grace & Co., charterers. The material clauses of the charter party are as follows:

"The said party of the first part (owner) * * * does covenant and agree on the freighting chartering of the whole of said vessel unto said party of the second part for a voyage from a mill or loading place on Puget Sound or Gray's Harbor * * * to Calloa, Peru. * * * Lay days to commence as soon as vessel is at loading berth designated by charterers ready to receive cargo; it being distinctly understood that owners are to give charterers at least 72 hours' notice of vessel's readiness to load; otherwise charterers to have 72 hours from receipt of notice before commencement of lay days. Charterers to have the privilege of loading vessel at two mills, the .time used in so moving to count as lay days.

"Said vessel shall be kept tight, staunch, strong, and in every way fitted for such a voyage, and receive on board for the aforesaid voyage the merchandise hereinafter mentioned, and no goods or merchandise shall be laden on board otherwise than from said party of the second part or their agents.

"The said party of the second part do engage to furnish the said vessel for the voyage aforesaid a full cargo of sawn lumber and/or timber of such lengths and sizes as can be taken through vessel's hatchway (and bow stern ports, if any). Lengths not shorter than 16 feet except at charterers' option. No lumber to be cut by ship without written authority from the charterers.

"Vessel to have the privilege of loading a deckload not endangering the safety of the cargo, ~~paying the extra insurance on same~~ Cargo on deck to consist of the largest sizes of rough lumber, unless otherwise directed by charterers.

' "Said party of the second part shall be allowed for the loading and discharging of said vessel, at the respective ports aforesaid, lay days as follows: 150 M per working lay day for loading, to commence (as per lines 15 to 17)

after the vessel is at loading place satisfactory to charterers, * * * ready to receive cargo; the master having given notice to that effect. For each and every day's detention by the fault of the parties of the second part or agents, they agree to pay to the said party of the first part demurrage at the rate of $500 per day. Should the vessel be detained by the master beyond the time herein specified, demurrage shall be paid to charterers at the same rate and in the same manner. Cargo shall be received and delivered within reach of vessel's tackles where she can safely lie afloat.

"Vessel to furnish within 5 days after arrival at loading place, as ordered, a certificate from a marine surveyor of the San Francisco Board of Underwriters that she is in proper condition for the voyage, and a further certificate in due course that she is properly loaded. Should vessel fail to pass satisfactory survey, and should she be detained more than 10 days for repairs, to enable her to pass such survey, this charter to be void at charterers' option, such option to be declared at the end of said 10 days. Lay days for loading not to commence before Monday, July 16, 1917. * * *

"Cargo to be stowed under the master's supervision and direction; charterers' stevedore to be employed at current rates, if loaded Puget Sound; otherwise ship's stevedore.

"Act of God, perils of the sea, fire, * * * collisions, strandings, and other accidents of navigation, even when occasioned by the negligence, default, or error of judgment of the pilot, master, mariners, or other servants of the ship's owner, civil commotions, floods, frosts, storms, fire, strikes, lockouts, and stoppages (partial or otherwise), or accident at the mill or on railways or docks; or strikes, lockouts or stoppages (partial or otherwise), or any other hindrances or delays of whatsoever nature connected with the working, delivery or shipment of the cargo, or any part thereof, beyond the charterers' or agent's control throughout the charter always excepted.

"Vessel to have a lien on cargo for all freight, dead freight, and demurrage, it being understood that all and any liability of the charterers under this agreement shall cease and determine as soon as cargo is on board; all questions, whether of demurrage or otherwise, to be settled with the consignees, the owners and captain looking to their lien on the cargo for this purpose. * * *"

It was provided in the charter that lay days should not commence before Monday, July 16, 1917, and that unless the ship was at a first loading mill as designated by the charterers on or before sundown on August 30, 1917, charterers should have the right of canceling or maintaining the charter, such option to be exercised within 48 hours after the arrival of the ship at such mill. When the contract was made there was no statement of the tonnage of the ship, and although her exact carrying capacity was not known, the dimensions of the cargo spaces were furnished to Grace & Co., and her capacity, including deck load, could be and was approximated at from 1,300,000 to 1,500,000 feet of lumber. Ross, agent for the owner at the time of the charter, told Grace & Co., that he believed the ship would carry not less than 1,500,000 feet; that she might carry more, but that he would not "guarantee" above a cargo of 1,500,000.

When the ship was completed on August 23, 1917, the master notified the charterers of readiness to begin loading cargo on August 28th. Grace & Co., through their agent, Robinson, advised Hansen to go to the deck of the St. Paul & Tacoma Lumber Company at Tacoma as the first loading berth, and that the second berth would be at the Defiance mill in South Tacoma. The ship reached the first berth on August 27th, and was ready to receive and did receive cargo about 1 p. m. on the 28th. Approximately 342,000 feet of lumber were loaded at the first berth, and the ship went to the Defiance mill on the afternoon of September 1st, where she commenced to take load on September 4th, and continued to take load (except on holidays) until September 12th, at which time her load approximated 626,000 feet in addition to the 342,000 previously taken. Of this quantity some 945,000 feet were loaded in the hold, the remainder on deck. The under deck cargo was not loaded at the average rate of 150,000 per day. On September 13th the ship left the Defiance mill and anchored off the St. Paul mill, and on the 14th of September re-

ceived approximately 85,000 additional feet from a lighter sent out from the Tacoma mill. The ship lay at anchor, and no more cargo was furnished until September 24th, when orders were received from the charterers to proceed again to the Defiance mill, whither the ship went on the 24th and commenced further loading, and continued until about noon of the 27th, receiving 154,000 additional feet. Again the ship was directed to go to the St. Paul mill, and on the 28th loading was there resumed, and continued till in the forenoon of the 29th; some 180,000 additional feet being loaded. From the forenoon of the 29th of September until October 6th, no cargo was furnished, and the ship was idle, but on October 6th 100,000 additional feet were furnished, and on October 8th at about 11:30 a. m. the vessel was fully loaded and about 1 p. m. shifted, preparatory to lashing cargo and going to sea. But in letting go of an anchor the "wildcat" of the windlass broke, and necessary repairs were not completed until October 16th.

Notice of the repairs and of readiness to sail was given to Grace & Co.; the master informing them that he was ready to sign the usual billing for this cargo, with the "usual and proper notation thereon" of demurrage charges claimed by the owners, and also notifying the charterers that, if the ship were detained beyond noon of October 17th, she would be on demurrage at $500 a day as provided in the charter party. Grace & Co. refused to acknowledge any claim of demurrage, declined to accept bills of lading with any notation of the owner's claim, and on October 19th libel was filed. Release bond was given, and after bills of lading were signed and certain preparations were made the ship sailed on October 23d with a full cargo of approximately 1,500,000 feet of lumber. Holidays and Sundays being excluded, the lay days expired at noon September 8th, and Hansen, libelant below, claimed demurrage from September 8th to noon of October 8th at $500 per day. From October 8th to October 17th, when repairs to the windlass were being made, libelant claimed no demurrage, but from October 17th to 19th he claimed demurrage at $500 per day. By the amended cross-libel the charterers claimed demurrage of 44 days at $500 per day, made up as follows: Six days in loading the hold of the ship; 24 days in loading the deck; and 14 days (October 8 to 23) after the ship was fully loaded and before commencement of the voyage.

The decision of the lower court awarded the owner demurrage for 32 days ($16,000), and allowed the charterers 8 days' demurrage ($4,000). This adjudged the owner entitled to $12,000, to which was added interest and costs. Charterers appealed. The cross-appeal of the owner is from that part of the final decree awarding 8 days' demurrage and deducting the amount from the $16,000 awarded him.

The errors assigned by the appellant charterers present questions of construction of the terms of the charter with respect to full cargo, to the obligations pertaining to deck and under-deck cargoes, to the provisions concerning loading, fault of the master, and whether strike conditions prevented the appellant from furnishing deck cargo in a reasonable time.

McClanahan & Derby, of San Francisco, Cal., and Kerr & McCord, of Seattle, Wash., for appellant and cross-appellee.

Bogle, Merritt & Bogle, of Seattle, Wash., for appellee and cross-appellant.

Before GILBERT and HUNT, Circuit Judges, and WOLVERTON, District Judge.

HUNT, Circuit Judge (after stating the facts as above). [1] It is argued by appellant that the subjects of deck and under-deck cargoes are found in separate paragraphs, and that appellant's initial obligation extended no further than the furnishing of an under-deck cargo; that by the use of the term "full cargo" in the first paragraph a full cargo under deck was meant, and that under the second paragraph the master

is given an exclusive option to load or not to load a cargo on deck; and that as a matter of law such option relieved Grace & Co. from the duty of providing a deck cargo before the master exercised the privilege of carrying one.

Our construction of the provisions of the charter party is that the charterers were allowed 10 working days within which to furnish the full cargo at the average rate of 150,000 feet per day. If the lay-day period commenced at 1 o'clock of August 28th, and holidays and Sundays are excluded from the lay-day period, the 10 lay days allowed the charterers for loading expired at noon on September 8th. From that time on, days of demurrage would run continuously without deduction, so that, when the last cargo was put upon the ship at noon of October 8th, there had been a detention for 30 days. There arose, then, an obligation on the part of the charterers to pay such demurrage, unless they were excused on account of some exceptive clauses to be found in the charter party. Charterers say that there is such an exceptive clause in that which pertains to strikes, lockouts, or stoppage, partial or otherwise, or any other hindrances or delays, of whatever nature, connected with the working, delivery, or shipment of the cargoes, or any part thereof, beyond the charterers' or agent's control.

The provision of the charter party whereby the owner covenanted and agreed to the freighting and chartering of the "whole of said vessel," and also the provision that the charterers did "engage to furnish the said vessel for the voyage aforesaid a full cargo of sawn lumber," measure the obligation. Although the shipowner never directly notified the charterers of any "option" to carry a deck load, the great weight of the evidence is that all concerned acted upon the assumption that the ship would carry a deck load. The charter was in the main in the usual form used by Grace & Co. with respect to Pacific Coast lumber charters. The ship was a motorboat, but there does not appear to have been anything unusual about the type which would affect her capacity to carry lumber, or her loading capacity generally. There was uncertainty in the minds of the charterers as to the amount of the deck load which the ship would carry, and what the height of her deck load might be; but it was the usual custom for ships in the lumber carrying trade to take deck loads, and we think that the evidence is that when the ship was chartered it was understood that she would carry a deck load. The stipulation in the charter party whereby the ship was to have the privilege of loading a deck load not endangering the safety of her cargo was not based upon a doubt as to the capability of the ship to carry a deck load, but upon how much deck load she would carry without endangering the safety of her cargo. Naturally the ship would carry as much of a deck load as was safe, and the charterers, for their own protection, insisted that the vessel should not carry a deck load so great as to endanger the safety of her cargo.

As further evidence that the charterers were concerned as to the safety of the cargo, there is the provision wherein the vessel is required to furnish a certificate from a marine surveyor of the San Francisco Board of Underwriters that the ship was in proper condition for her voyage and that she was properly loaded. The obligation

of the charterers being to furnish the ship a full cargo, notification by the owner to the charterers that a full and complete cargo would require not less than 1,500,000 feet fixed the obligation on the charterers to furnish such cargo. The stowage of the cargo being under the supervision of the owner, it was immaterial to Grace & Co. where the 1,500,000 feet should be stowed, provided, always, the stowage was such as not to endanger the safety of the cargo. The testimony of Mr. Thompson, of the Douglas Fir Company, was that the charter required full and complete cargo, and that it made no difference how much the vessel would take, and Robinson seems also to have understood the charter party as imposing upon the charterer the obligation to furnish a full and complete cargo.

Appellant's claim for 6 days' demurrage in loading the under-deck cargo rests upon the hypothesis that the obligation of the charterers to furnish a full and complete cargo was of a twofold nature: primarily, to furnish an under-deck cargo; and, secondarily, to furnish a deck cargo—the latter part of the obligation, however, not arising until the owner had exercised his option to carry such deck load. But, as we construe the charter, Grace & Co. being obliged to furnish a full and complete cargo of not less than 1,500,000 feet for loading within the lay days provided in the contract, the rate at which the under-deck cargo was loaded became immaterial. The rate at which the loading would be carried on would not necessarily detain or delay the loading of the ship. The fact is undisputed that the charterers did not furnish a full cargo of 1,500,000 feet, so that the whole of the cargo could have been loaded on board the ship within the period of the lay days provided for in the charter party. Alexander Sons v. Aktieselskabet, 25 Com. Cus. 21. The demurrage clause of the charter party contains a provision for payment of demurrage for each and every day's detention by the fault of the charterers, which means ultimate detention in the vessel's loading beyond the 10 days allowed by the charter for loading. That such is the true construction is confirmed by that clause of the charter party which provides that time used in moving from one loading mill to another should count as lay days. It could hardly be that there was an obligation to load the full 150,000 feet each day, and yet that the time used by the ship in moving from one mill to another should count as lay days.

[2] Nor can we agree with the appellant that the duty of loading the cargo at the charter party rate fell upon the appellee. The language used "allowed" the charterers a prescribed time for loading. The fact proved was that the work of loading was done by stevedores, and not by employés of the loading mills or the crew of the ship. The stowage was under the master's supervision and direction, but the loading was not. It was expressly provided in the charter party that the cargo was to be stowed under the master's supervision and direction, "charterers' stevedore to be employed at current rates." The evidence is that the charterers' stevedores loaded the cargo of lumber here involved as directed by the lumber inspectors of the charterers. The argument that the stevedores were at fault in loading with only one gang, and that the progress in loading was not satisfactory, does not

help the charterers, inasmuch as it was their duty to have provided additional stevedores, or otherwise to have made provision for the expedition of the work of loading. It is also established by the evidence that the work of loading, when first undertaken at the St. Paul and Defiance mills, could not have hastened the final loading of the ship, because the ship and the stevedores were idle and waiting for cargo for some 12 or 13 days after the first cargo had been loaded on the ship.

There does not appear to have been any act of the master in respect to the stowage of the hold that caused the delay in the loading of the ship beyond the 10 lay days. The real reason, as we read the evidence, why the ship did not complete her loading and stowage within the lay day period was the failure of the charterers to furnish the full cargo within the lay day period. The first quantity loaded, approximately 343,000 feet, was loaded in less than 4 days, and the ship shifted to the Defiance mill with 6 lay days remaining. But upon reaching the Defiance mill there were less than 600,000 feet of lumber for the ship. It was then that Capt. Ross was told by the people at the Defiance mill that no further lumber had been ordered for the Hansen. It appears, too, that it was at that time that the agent of the captain of the ship realized that there would be an unreasonable detention. The charterers ought to have had approximately 1,200,000 feet to complete the cargo, whereas they had less than 600,000 feet. Thus a condition arose which made it quite apparent that the ship would be idle for some time. All the cargo on board at the Defiance mill, and also all cargo cut while the vessel was lying at the Defiance mill, was loaded and stowed by September 15th. Under no circumstances could there have been a delay of the ship by failure to load at the rate of 150,000 per day, for the ship was detained until September 24th, and it appears that she could not have been loaded prior to that date. A surveyor employed by Grace & Co., who was on the ship when she loaded the latter part of her cargo, testified that the effect of a failure to load the initial cargo at the rate of 150,000 feet per day would be to give appellant that much more time to have placed their order for the balance of the cargo and get it out that much sooner. Jenneson, Taylor Co. v. Secretary of State for India, 86 L. J. K. B. 283, [1916] 2 K. B. 702, 22 Com. Cus. 1.

We conclude that compliance with the charter provision to load within 10 days was impossible by reason of the failure of Grace & Co. to furnish the cargo for loading within that period of time, and that there is no substantial merit in the contention that there should be a separation of lay days for loading as between under-deck and on-deck cargo.

[3] We come, now, to the claim of Grace & Co. that it was prevented from furnishing full cargo to the ship by reason of strike conditions existing at the loading mills. Again we find the argument of the appellant advancing the contention that there was the initial obligation to furnish the full under-deck cargo, and that, if the owner elected to carry an on-deck cargo, then it became the duty of the charterers to furnish such on-deck cargo. Proceeding along these lines, the charterers urge that they complied with the initial obligation to fur-

nish an under-deck cargo, which was ready at the time the vessel went on berth, but that the ship or master did not elect to carry on-deck cargo until after the entire under-deck cargo had been completely loaded, at which time the loading mills were involved in strikes, and that when the master exercised the "option" to carry on-deck cargo he knew of such strike conditions, and knew that delay would ensue, and that therefore he exercised the option with the liability for all risk of detention of the ship in her loading in connection with the furnishing of the on-deck cargo. But, going back to the provision of the contract under which the charterers obligated themselves to furnish the vessel a complete cargo, and to our view of the charter party, the covenant to furnish full cargo is not divisible; hence delay in furnishing cargo would not be excused, except upon some ground expressed in the provisions of the contract.

The question then arises: Were the charterers prevented from furnishing the cargo as called for by the charter party solely by reason of causes beyond their control and within the exceptive clauses of the charter party? It is shown that there were labor troubles at the Defiance mill and at the St. Paul mill; that a number of other mills closed down; that conferences were had between the officers of the Defiance Company and the men; and that because of coercion by outside influences many men quit work. On the other hand, before the Hansen went on berth in August, 1917, it was given out by the officers of the West Coast Lumbermen's Association, of which the St. Paul mill was a member, that the mill had resumed work, and by September 6th, while the Hansen was still on berth, Allen, secretary and manager of the association, stated to the press representatives that the St. Paul mill was operating with a full crew. There was a reduction in operation, but written mill reports disclosed that there was a total cut of 600,000 feet for the week ending August 18th, that rail orders were accepted for that week for 11 cars, that local orders were accepted for 50,000 feet, and that in filling local orders 45,000 feet were shipped; that for the week ending August 26th 600,000 feet of lumber were cut; that there were rail and local orders aggregating very large quantities, and 75,000 were shipped; that for the week ending September 1st 600,000 feet were cut, rail orders were accepted for 125 10 cars shipped, 81,000 feet shipped locally; that for the week ending September 8th the mill cut 600,000 feet, for the week ending September 15th, 897,000 feet, and for the week ending September 22d, 1,900,000 feet. At the Defiance mill reports showed that for the week ending August 25th there was a cut of 681,937 feet, and that for the time between August 27th to September 1st the Defiance mill cut 614,511 feet, and from September 1st to September 12th cut 840,399 feet, and from September 12th to 21st cut 766,896 feet. These figures, together with others which need not be given, are strong evidence that when the ship went on berth August 28th strike conditions did not impede operations sufficiently to prevent the mills from furnishing the Hansen the cargo called for by the charter party.

[4] Furthermore the strike conditions were confined to the mill employés, or those who were exclusively working in the manufacture of

the lumber, and who did not in any way engage in transporting the lumber to the loading port, or did actual work in loading the lumber. There can be no extension of the scope of the exemption clause, so as to include the labor of manufacturing the cargo. Construction in accordance with the general rule would be that, when the charterer makes a contract for the use of a ship, the presumption is that he has a cargo in existence with relation to which the contract is made. It is not a part of the contract that the provisions shall pertain to procurement of the cargo. Carver on Carriage by the Sea, §§ 252–257a; Scrutton on Charter Parties, art. 42; Tons of Nitrate v. McLeod, 61 Fed. 849, 10 C. C. A. 115. See, also, Grant v. Coverdale, L. R. 9 App. Cas. 470; The India, 49 Fed. 76, 1 C. C. A. 174; McLeod's Case, supra; Gardinier v. McFarlane, 20 Sess. Cas. 414; Sorenson v. Keyser, 52 Fed. 163, 2 C. C. A. 650; Arden S. S. Co. v. Weir, 10 App. M. C. (N. S.) 135.

One of the leading cases cited by the appellant is Dampstibsselskalut Danmark v. Paulsen, [1913] Sess. Cas., supra, where the exemption clause of the charter party is much like that under consideration. While there is language in the opinion to uphold appellant's contention, the decision itself was upon the ground that the charterer failed to place timely and binding orders for his cargo to be delivered to the chartered ship within the loading period and provided in the charter party, and that therefore the charterer could not fall back on the exemption clause to defend against the shipowner's claim for demurrage. The court did not reverse the decision in the Gardinier Case, supra, where it had been held that an exemption clause quite like that before us only goes to cover causes which conduce to the failure of the charterer's obligations under the contract and do not cover causes which delay the procuring of the cargo.

In the present instance the use of the word "working" in the exceptive clause, which often appears in colliery charter parties, may call for broader application than if there were no such word; still we do not believe that it means the producing and manufacturing of the cargo, and unless the language makes it plain that the parties intended that the shipowner would assume the risk of delay in the supplying of logs to the mills and the manufacturing of logs into lumber, no such construction should be adopted. Carver on Carriage by Sea, 258a; Grant v. Coverdale, supra.

There is some evidence that appellant failed to exercise due caution in placing binding orders under which the loading mills would have been obliged to furnish the cargo for loading the Hansen within the lay-day period. The testimony shows that there was some expectation of danger of a shutdown, and that if certain orders for lumber had been placed 30 days before the labor troubles occurred orders could have been completely filled. There was an actual shutdown of the St. Paul mill from July 26th to August 13th, at which time the mill reopened with a small force and gradually increased its efficiency. A shutdown at the Defiance mill was from July 26th to August 20th, when operations were resumed and approximately 75 per cent. efficiency

was attained. It is not necessary to enter into a detailed statement of the number of feet cut for export lumber out of the total cuts, but we gather from the statements in evidence that there was a lack of due diligence on the part of the appellant to secure lumber for the Hansen after the ship went on berth up to the time her lay days expired, and that there was also lack of due diligence used to furnish the ship with lumber after the expiration of the lay days when the ship was on demurrage.

[5] As to the extent and scope of the demurrage provision of the charter party, our opinion is that all detention beyond the time set for loading and not excused under the provision of the contract should be paid for at the rate agreed upon between the parties. The word "demurrage" is not to be construed as having been used in its strict legal sense, where, as here, the parties intended to agree that the voyage must be begun at the end of the time required to load the ship, and for each and every subsequent detention day the sum of $500 was fixed, subject to exceptions in the contract. This seems to have been the construction put upon the contract by the parties themselves, for both claim $500 demurrage per diem for failure in initiating the voyage after the vessel was completely loaded. The owner is asking for $1,000 for the 2 days between October 17th and 19th, while the charterers claim $7,000 for 14 days between October 8th and 23d. It would seem as if the parties had understood that, if time common to both were used without sufficient excuse by one, compensation must be awarded to the other. Inverkip S. S. Co. v. Bung, 22 Com. Cas. 200.

[6] The contention of the appellee is that the award to the owner of demurrage for the two days (October 17th to 19th) was caused by the refusal of the charterers either to pay the owner's claim for demurrage or to issue bills of lading with notations thereon that the owner claimed demurrage during such period. The detention of the ship does not appear to have been justified upon the ground that the master had a right to detain the ship in order to effect the payment of a demurrage claim. He could have promptly exercised a lien against the cargo, and such course would have been followed, doubtless, by the immediate release of attachment by the giving of a bond, and, had such course been pursued on October 9th, the voyage could have been commenced after the ship's repairs were made. But it appears that when the loading was completed, and on October 9th, Grace & Co., presented to the master bills of lading which the master, as already said, refused to sign. In these bills of lading there was a provision that "negligence clause and all other conditions as per charter party dated Seattle, June 12, 1917." The proper construction of the lien and cesser clause of the charter is shown by the decision of this court in Elvers v. Grace & Co., 244 Fed. 705, 157 C. C. A. 153. There the lien and cesser clause was the same as in the case before us, and the ruling of the court was, as applied to the case under consideration, that when the Hansen was loaded the owner, because it was at least doubtful whether his lien on the cargo was preserved against the consignee, had a right of action in personam against Grace & Co. for the loading demurrage, and such right was enforceable without the need

of detention of the vessel. The master of the Hansen, therefore, had a remedy, and we do not think that detention was justifiable after the ship was fully loaded and ready to sail on October 17th.

[7] The master makes no claim for the 8 days used in making repairs to the wildcat. Appellant contends that this detention was for the purpose of making the ship seaworthy for the voyage, and that therefore such detention was not caused by the charterers. The contract required that the ship "shall be kept tight, staunch, strong, and every way fitted for such voyage." The breaking of the wildcat obviously made the ship unfit for the voyage, and, as such condition existed before the voyage was commenced, it would seem that for detention by the master the agreed demurrage should be paid to the charterers. Carver on Carriage by Sea, p. 834. The importance of having the windlass in fit condition is emphasized by the witnesses and the evidence that the underwriters would not have allowed the ship to proceed on the voyage with a broken windlass. The 10 days allowed for repairing the windlass is apart from the demurrage clause, and is in the warranty that the vessel, having been declared fit and a certificate of fitness having been issued, shall be kept fit. The breaking of the windlass was not an accident of navigation, but was apparently due to a defect for which claim was made against the company which built the ship. Bowring v. Thebaud, 56 Fed. 520, 5 C. C. A. 640; The Maumee (D. C.) 260 Fed. 862; Carver on Carriage by the Sea, §§ 21, 144; S. S. Wellesley Co. v. Hooper, 185 Fed. 733, 108 C. C. A. 71; Gilchrist Transportation Co. v. Boston Insurance Co., 223 Fed. 716, 139 C. C. A. 246.

[8] Appellant's point that the notice of readiness to load given by the ship was not sufficient is without substantial merit. It appears that on August 25th direct notice was given of the readiness of the ship, that the ship arrived on August 23d, that thereafter instructions were awaited from the charterers, and that subsequently loading commenced by the delivery of lumber at the ship's tackle on August 28th.

[9] Appellant asks a deduction for a half day on September 11th, because of a breakdown of the donkey engine of the ship. According to the log, no loading was done in the forenoon of Tuesday, the 11th "on account of damaged donkey boiler; 12:30 p. m. began loading again and took in 39,122 feet." The breakdown did not occur during the lay days, but it is quite evident that the reason that there was no loading in the forenoon of that day was because of the damaged donkey boiler, and under the contract we think there should be a deduction of $250 for that half day.

[10] Appellant also contends that there should be a deduction for the failure of the ship to load on September 25th. The evidence is that the ship reached the Defiance mill at 3 p. m. September 24th. On the 25th the stevedore decided that there was not enough lumber on hand to start to load and that it would be better to avoid the expense of bringing his men down from the city and wait until he got at least a half day's work to start in on. Inasmuch as the fault appears to have been on the part of the charterers' stevedores, we do not think the allowance should be made.

[11] As already stated, the ship was fully loaded on October 8th, but did not commence her agreed voyage until October 23d. From the 8th to the 17th, repairs necessary to prepare the ship for the voyage, as we have shown, were the cause of detention, but for those 8 days no claim is made by the appellee. We have also held that appellee should not be allowed demurrage for the 2 days from October 17th to 19th. Nor should the appellee be allowed for detention of the ship from the 19th to the 23d (3 days); the detention seems to have been unnecessary. The demurrage controversy was for the time being disposed of on the 19th by the filing of a libel and the furnishing of a release bond; for detention after that date the master cannot claim.

Our conclusion is that the decree of the District Court should be modified, so as to allow in favor of appellant, not only the deductions made by the District Court, but in addition thereto $1,000, or $500 per day for the 2 days from October 17th to 19th, and also $500 per day for the 3 days from October 19th to 23d, and $250 for the half day as heretofore indicated. This would reduce the amount allowed to libelant to the sum of $9,250, which sum should bear interest from October 8, 1917, and costs should be taxed as per stipulation on file, dated November 22, 1919.

As so modified, the decree will be affirmed.

## On Rehearing.

PER CURIAM. After careful consideration of the several matters concerning which the court desired a rehearing, we think that, except as hereinafter noticed, the opinion filed sufficiently covers the points urged by the appellees. In contending that they should be allowed 6 days' demurrage in the loading of the vessel's hold, appellants revert to the question of the initial obligation of the charterer, and to where the fault was for a delay of 6 days in loading the hold.

[12] But, as already decided, our construction of the charter party is that the charterer was obligated to furnish a full cargo of sawn lumber or timber, and we believe the charterers could select the sizes and dimensions of the lumber subject to limitations made with relation to the hatchways of the ship. The stowage was to be under the master's supervision subject also to limitations as to sizes of rough lumber. We cannot find that there was all the uncertainty as to the vessel's carrying capacity which counsel urge existed, for the evidence is that it was understood that a full cargo was wanted and that such a cargo would not be less than 1,500,000 feet. This estimate was evidently understood by the agent of Grace & Co. who evidently knew that in the estimate a deck load was included.

[13] It is but reiteration to say that when the parties agreed that the charterer should be allowed for the loading of the cargo "150 M per working day," provision was made for fixing the definite number of lay days, but there was no creation of obligation that 150,000 feet of lumber must be loaded each and every day. As bearing upon the customary method of fixing lay-day periods in charters for lumber we cite: Bailey v. Manufacturers' Lbr. Co. (D. C.) 224 Fed. 806; Wallace v. Cargo of Pine Boards (D. C.) 224 Fed. 993; The Olaf (D. C.) 248 Fed.

807. Ten days for loading the entire cargo was allowed to the charterer, and we adhere to the opinion that the charterer did not furnish the full cargo or load it within the 10 days.

[14] Appellants say that the court erred in finding that the charterer's stevedores loaded the cargo. Our statement to that effect was warranted, we think, by testimony of witness Anderson, the foreman and representative of the Puget Sound Stevedore Company, who negotiated with the captain and owner of the ship concerning the stevedore contract, and from whose testimony we quote:

"Q. Now, who gave you your orders as to what lumber to take aboard and where to stow it? A. I got my orders from Grace's representatives. Q. Did they give you orders in what order to take it aboard? A. They would show me lumber, where it was. Q. But, I mean, from whom did you get your orders as to the order of stowage? A. Well, that was part of the contract for me to stow the ship. Q. And did you take the particular lumber on hand at the St. Paul mill, which you considered proper for stowage in the hold first, did you select that lumber? A. Well, as stevedores, we do have the choice of selecting the lumber, as a rule."

[15] The fact that employment of the stevedores was by the ship was not necessarily in conflict with the provision of the charter party, for the status of the stevedores employed was that they were charterer's stevedores. However, the point does not seem to us to be vital for no matter what view should prevail the obligation of the charterer was to load within the lay days at the rate specified. Bailey v. Mfg. Lbr. Co. (D. C.) 224 Fed. 806.

[16] Inasmuch as we have decided that there should be a deduction from the award to libelant for the 2 days from October 17th to 19th, there should be an addition of the allowance for the 2 days to the claim of the appellant under its cross-libel; and we think appellant is entitled to demurrage for 4 days, namely, October 19th, 20th, 21st, and 22d, and not 3 as was directed in the decision filed.

The decision filed will therefore be modified to conform to these allowances, and, as so modified, will stand reaffirmed. Costs to be taxed as per stipulation on file.