## CREIGHTON *v.* DILKS *et al.*[1]

### (*District Court, E. D. Pennsylvania.* February 2, 1892.)

**1. DAMAGE—LIABILITY OF CHARTERER.**
  A charterer, having notice of the vessel's readiness, and being bound to deliver the cargo, is liable for demurrage for delay caused by loading and discharging a quantity of iron not intended to be shipped, which an employe of the charterer erroneously designated as part of the cargo.

**2. SAME—LOADING ON SUNDAY.**
  A master, in the absence of agreement or consideration to the contrary, is not bound to permit the charterer's stevedores to load the vessel at night or on Sundays.

**3. SAME—MEASURE OF DAMAGES.**
  The measure of damages for delay caused by the charterer, who had agreed to load with "customary dispatch," negligently loading, and being obliged to discharge a wrong cargo, is not demurrage for the time spent in such loading and discharging, but the time spent in getting the vessel loaded over the time it would have taken to load with "customary dispatch."

In Admiralty. Libel by James E. Creighton, master of the schooner Mary O'Neill, against George H. Dilks & Co. to recover demurrage for alleged delay in loading said vessel. Decree for libelant for $302.50.

*John F. Lewis,* for libelant.

*F. I. Gowen,* for respondents.

BUTLER, District Judge. On September 17, 1889, the respondents chartered the schooner Mary O'Neill (of which libelant is master,) to carry a cargo of railroad iron from the Philadelphia & Reading Railroad Company's wharves at Port Richmond, Philadelphia, to Birmingham, Ga. The schooner was required to be in readiness for loading on the following Monday. "Customary dispatch" was allowed respondents for loading, and in case of further detention $55 per day were to be paid the vessel for loss of time. The schooner was in readiness at the time appointed;

[1] Reported by Mark Wilks Collet, Esq., of the Philadelphia bar.

and the loading commenced late on that day. The iron was pointed out by an employe of the railroad company, at the wharf, and loaded under the direction of Mr. Shannon, chief stevedore employed by the respondents (through Mr. Boney)—as he testifies—for this purpose. The iron turned out to be other than that which the respondents intended to ship, but the mistake was not discovered until a large quantity had been loaded. When discovered the iron was ordered off; and about seven days' time was lost by the error. The loading in consequence was not complete until the night of the 21st of September. The libelant claims compensation for the loss of time to which he was subjected. The respondents deny liability on the grounds that the mistake, as they allege, was not theirs; and that, even if it was, there would not have been any detention over the time allowed for loading, if the libelant had permitted them to work at night. Neither position can be sustained. It was the duty of the respondents to deliver the cargo to the vessel. They knew she was at the wharf, ready to receive it, the terms of the charter required them to take notice of the fact, and besides express notice to them is averred in the libel, and not denied. They depended upon others to point out and load the iron they desired to ship, and are responsible for their acts. There is no room for pretense that the error arose from any fault of the libelant.

The second position is equally untenable. The respondents had no right to call on the libelant for permission to work on the vessel at night or on Sundays. Neither the charter, nor any custom entitled them to such permission. It is unimportant what induced the libelant to refuse. It is plain, however, that loading at such a time would have subjected him to disadvantages; not only for the reason which he states, but for the additional one that it was his duty to be present when the loading was being done, and to superintend the storage of the cargo. The testimony of the respondents' witnesses respecting what he said after the mistake was discovered does not show a contract that the work should proceed at night, or on Sundays. Even if it showed an agreement that it might, he would not be bound, in the absence of a consideration for his promise; and none is suggested. I incline to believe, however, that his own testimony on this subject—which is that he offered to agree provided he was compensated for five days' time which he then supposed would be lost—is nearer an accurate statement of what occurred. He is more likely to know what he said than other witnesses are, and this statement seems more consistent with probabilities; and finds some corroboration in what the respondents' witnesses say. Although the libelant is entitled to recover for loss of time, it does not follow that the loss is to be measured by time occupied in taking on and putting off the wrong iron. The charterers were entitled to so much time as was necessary to load, employing "customary dispatch." For such detention as he was subjected to beyond this time he is entitled to compensation; but to no more. A good deal more than customary dispatch was used after the error was discovered; and a little before. How many tons should have been loaded per day with such dispatch, is not

entirely clear. The respondents' witnesses disagree respecting it. Mr. Shannon, who is probably most competent to form a just estimate, says, "100 tons could have been loaded easily." The vessel, as he says, was especially adapted to speedy loading of such cargo. Before the error was dicovered the loading was at the rate of about 140 tons per day. The work continued, however, for 11 hours while the customary hours of working are but 10. It was understood that the libelant was anxious to get away, and there was something probably more than customary speed shown, aside from the gain obtained by working the extra hour. I believe it is safe to say that with the dispatch required by the charter 125 tons per day should have been loaded; and I do not think it safe to place the rate higher. At this estimate 6 days would have been required to load the 725 tons carried. To this must be added one day for the Sunday which intervened. I think half a day should also be added for the time it rained on Friday, when, according to custom, the men would not work. Mr. Shannon speaks of rain on the preceding day also, but it is manifest, I think, that he is speaking of the night of the 10th. Other parts of his testimony seem to show this, and that the day was not wet. Seven and a half days, therefore, should be allowed for loading. The vessel was detained until the night of the 21st of the month, covering a period of 13 days. Taking $7\frac{1}{2}$ from this leaves $5\frac{1}{2}$, which represents the loss of the time to which the vessel was subjected, and for which it should be paid—at the rate provided by the charter. This will give him $302.50. A decree may be entered for this sum, with costs.