YONE SUZUKI et al. v. CENTRAL ARGEN-
TINE RY., Limited, et al.

Circuit Court of Appeals, Second Circuit.
August 20, 1928.

No. 253.

1. Courts ☞98—Decision of Argentine Court
of Appeal, running counter to universal mari-
time law, will not be deemed authoritative as
to law of Argentine.

Single decision of Court of Appeal of Ar-
gentine, that runs counter to universal mari-
time law, will not be accepted as authoritative
as to law of Argentine, nor as binding on other
courts, where such decision is not given binding
effect as precedent in Argentine.

2. Shipping ☞171—Cesser clause in charter
party, relieving charterer of liability for de-
murrage, held not incorporated in bill of lad-
ing by reference.

Cesser clause in charter party, providing
that charterer's liability shall terminate as
soon as cargo is loaded and freight paid, and
giving vessel lien on cargo for freight, demur-
rage, and all sums becoming due under contract
of affreightment, is a personal exemption in
favor of charterer, and is not incorporated by
reference in bill of lading, so as to inure to
benefit of indorsee thereof.

3. Shipping ☞34, 102—Charters and bills of
lading involving carriage of coal to Argen-
tine held American contracts, and Argentine
law did not apply thereto (Harter Act [46
USCA §§ 190–195]).

Where charter parties providing for carriage
of coal to Buenos Aires were executed, bills of
lading were issued, and all other transactions in
respect thereto, including passing of title, took
place in United States, charter parties being on
standard Washington coal form, reciting that
the freighting was subject to terms and ex-
emptions of Harter Act (46 USCA §§ 190–195),
that general average was to be settled according
to New Antwerp Rules of 1890, and as to mat-
ters not therein provided for according to the
law of New York, charters and bills of lading
were American contracts, and Argentine law
did not apply thereto.

4. Shipping ☞174—Consignee, accepting car-
go, held liable for demurrage at discharging
port under bill of lading giving ship lien for
demurrage.

Consignee, accepting delivery of cargo un-
der bill of lading incorporating terms of char-
ter party, giving vessel a lien on cargo for de-
murrage in all sums which may become due
vessel under contracts of affreightment, held
liable to shipowner for any demurrage occurring
at discharging port, unless it was occasioned
by shipowner's fault or covered by some ex-
ception in bill of lading.

5. Shipping ☞175—Bill of lading, imposing
liens on cargo for demurrage, held to make
consignee liable for demurrage at loading
port.

Provision of charter party, expressly in-
corporated by reference into bill of lading, im-
posing liens on cargo for demurrage in all sums
which may become due steamer under contract

of affreightment, held to make consignee liable
for demurrage incurred at loading port.

6. Shipping ☞181(4)—Under charter making
lay days commence 24 hours after arrival "at
or off port" lay days began 24 hours after
vessel arrived at Buenos Aires Roads;
"port."

Under charter party providing for carriage
of coal to Buenos Aires or as near thereunto
as steamer may safely get and always lie afloat,
lay days for discharging to commence 24 hours
after arrival at or off discharging port, wheth-
er steamer is in berth or not, held, that ship
arrived "at or off port" when it reached the
roads, and lay days began 24 hours thereafter,
notwithstanding roads were 20 miles from
basins and docks; "port" ordinarily being place
where port authorities are exercising jurisdic-
tion.

[Ed. Note.—For other definitions, see Words
and Phrases, First and Second Series, Port.]

7. Shipping ☞181(4)—If readiness to dis-
charge were test of beginning of lay days,
they would begin when vessel arrived at port,
not at or off berth.

Even if charter party made "readiness to
discharge," and not arrival "at or off" the port,
the test of the beginning of lay days for dis-
charging cargo, those days would begin when
the vessel arrived at port, and not when she
arrived at or just off her berth.

8. Shipping ☞183—Vessel's payment to con-
signee for coal undischarged to prevent loss
of another charter by delay in sailing held not
to release demurrage claims.

Where vessel was so delayed in discharging
coal cargo that she feared loss of another char-
ter, and accordingly arranged to pay consignee
for 93 tons of coal still undischarged, so that
she could sail, held, that this transaction did not
involve steamship owner's release of all claims
against consignee, including demurrage claims.

9. Shipping ☞178—Where delay in discharg-
ing was caused by consignee's sending ves-
sels to dock where strike of longshoremen
prevailed, running of lay days held not post-
poned by strike; "demurrage."

Under charter party requiring cargo to be
taken from alongside vessel as quickly as ves-
sel can deliver, but in no case at less than 1,000
tons daily, not providing for any allowance in
ascertaining demurrage for time lost in dis-
charging on account of strikes, held, that run-
ning of lay days was not postponed by strike of
stevedores and longshoremen, affecting only por-
tion of the discharging area of the port, not-
withstanding general provision excepting
strikes, where delay was due to consignee's
sending of vessels to dock where strike pre-
vailed; "demurrage" being extended freight.

[Ed. Note.—For other definitions, see Words
and Phrases, First and Second Series, Demur-
rage.]

10. Shipping ☞181(2)—Charter requiring con-
signee to take not less than 1,000 tons daily
from vessel held to establish rate for deter-
mining lay days.

Charter party providing that cargo shall
be taken from alongside of vessel by consignee

at port of discharge as quickly as steamer can deliver, but in no case at less than 1,000 tons per running day, *held* to require consignee to take not less than 1,000 tons daily.

**11. Shipping ☞184—Burden of proving what delay was due to vessel's fault held on consignee, as respects demurrage liability.**

As respects consignee's liability for demurrage under bill of lading, burden of proving what delay, if any, was due to fault of vessel *held* on consignee.

**12. Shipping ☞177(1)—Merchant, undertaking to discharge cargo within fixed number of days, is liable for delay beyond that period, unless attributable to shipowner's fault.**

Where a merchant has undertaken to discharge ship within a fixed number of days, he is liable in demurrage for any delay of the ship beyond that period, unless such delay is attributable to fault of shipowner, or those for whom he is responsible, and risk of delay from causes for which neither of the contracting parties is responsible is with the merchant.

**13. Shipping ☞183—Consignee held liable for reasonable expenses incurred by ship in discharging cargo, not exceeding demurrage saved.**

Under charter party providing that cargo shall be received alongside steamer, where she can discharge safely afloat within reach of her tackles, and that expenses of wharfage and lighterage shall be the expenses of her cargo, *held*, that shipowners were entitled to recover from consignee expenses reasonably incurred, including lighterage and demurrage of lighter, stevedores, expenses in discharge from lighter to docks, extra expenses of overtime stevedoring on Sundays and holidays, expense of shore cranes and shore capstans at night, and other extra expense of discharging at night and at meal hours, to the extent that such expenses were not more than demurrage saved, irrespective of whether breach of contract existed when they were incurred.

**14. Shipping ☞177(2)—Charter requiring consignee to take not less than 1,000 tons per "running day" held not to require steamer to discharge continuously day and night.**

Clause in charter party that cargo is to be taken by consignee as quickly as steamer can deliver, but in no case at less than 1,000 tons per "running day," *held* not to require steamer to discharge continuously day and night.

[Ed. Note.—For other definitions, see Words and Phrases, Running Days.]

**15. Shipping ☞175—Cesser clause held not to relieve charterer of its liability for demurrage at loading port before bills of lading signed, but relieved it of obligations thereafter.**

Cesser clause in charter party, providing that charterer's liability shall terminate as soon as cargo is loaded and freight paid, and giving steamer lien on cargo for freight, demurrage, and all sums becoming due under contract of affreightment, relieved charterer from all obligations to shipowners for demurrage sustained at loading port after bills of lading were signed, but not from its liability therefor incurred before bills of lading were signed, and consignee's liability for such loading demurrage was secondary to charterer's liability therefor.

**16. Corporations ☞579(2)—Liability of new corporation for obligations of old one held dependent on value of property transferred to it.**

Where stockholders divided corporation's quick assets and incorporated another corporation for purpose of succeeding to good will of old company, liability of new corporation on obligations of the old one must depend on extent of value, if any, of property transferred to it from old corporation.

**17. Admiralty ☞7—Admiralty court held without jurisdiction to reach assets transferred by corporate charterer to new corporation in shipowner's suit for demurrage (Admiralty Rule 56 [see title 28, § 723]).**

Where assets of corporate charterer, impleaded under Admiralty Rule 56 (see title 28, § 723), in shipowner's suit for demurrage and expenses in discharging cargo, had been transferred to another corporation, admiralty court had no jurisdiction to reach and apply such assets to shipowner's claim in accordance with method ordinarily afforded only by creditors' bill.

**18. Admiralty ☞12—Charterer's agreement to ship coal in vessels sailing 10 days apart, and to deliver coal on land, held nonmaritime, and not enforceable in admiralty (Admiralty Rule 56 [see title 28, § 723]).**

Charterer's agreement to ship coal to consignee in vessels sailing 10 days apart, and to deliver coal on land, *held* nonmaritime, and could not be enforced in admiralty, either directly or by remedy over under Admiralty Rule 56 (see title 28, § 723).

Appeal from the District Court of the United States for the Southern District of New York.

Libel by Yone Suzuki and others against the Central Argentine Railway, Limited, in which the Gano Moore Coal-Mining Company, Inc., and another, were impleaded. From an interlocutory decree (19 F.[2d] 645) in favor of libelants, the Central Argentine Railway, Limited, appeals. Modified and affirmed.

See, also, 19 F.(2d) 665.

Appeal by Central Argentine Railway, Limited, from an interlocutory decree granted in the United States District Court for the Southern District of New York, in admiralty, awarding libelant, Suzuki & Co., demurrage incurred by the steamship Kofuku Maru and the steamship Seifuku Maru at the port of loading, and awarding the same libelant demurrage and extra expenses incurred by said vessels at the discharging port; also awarding libelant Holland-American Line demurrage and extra expenses incurred by the steamship Yseldijk at the discharging port; also awarding libelant

Green Star Steamship Company demurrage and expenses incurred by the steamship Plymouth at the discharging port; and also awarding libelant Luckenbach Steamship Company demurrage and extra expenses incurred by the steamship Edenton at the discharging port, and dismissing the petition of Central Argentine Railway, Limited, to implead Gano Moore Coal-Mining Company, Inc., and dismissing the libels as to it.

Four libels in personam were filed against Central Argentine Railway, Limited, by the owners of the above five vessels, to recover demurrage and expenses alleged to be due under bills of lading issued to Gano Moore Company and indorsed by them to the railway. These causes were afterwards consolidated.

Early in 1920, the railway entered into contracts with Gano Moore Company, Inc., for the purchase of a number of cargoes of coal c. i. f. terms. Under the contracts vessels were to be chartered by Gano Moore Company to carry coal, and payment was to be made to it in New York against shipping documents through letters of credit.

Pursuant to these contracts Gano Moore Company chartered the vessels involved in this case for the carriage of coal to Buenos Aires. The charters were all on the Shipping Board Washington coal form July, 1919, and are substantially alike.

The important clauses in each charter, all of which agree "to freight on the said steamer * * * to Buenos Aires, or as near thereunto as she may safely get and always die afloat," are:

"3. The act of God, restraint of princes, rulers, and people, fire, and all and every other dangers and accidents of the seas, rivers, and steam navigation of what nature and kind soever, riots and strikes always mutually excepted.

"4. Lay days for loading * * * to commence from time steamer is ready to load (or within 96 hours after readiness to load if delayed awaiting turn at berth) and master has given notice in writing of such readiness to the party of the second part or his agent. * * * Cargo to be loaded into steamer with customary dispatch, in accordance with the rules of the port of loading, but in no case at less than 1,500 tons per running day, Sundays and legal holidays excepted. * * * "

(Clause 4, supra, is quoted from the Siefuku Maru and Kofuku Maru charters, and is pertinent only in respect to the claim for loading demurrage of their owners.)

"5. Lay days for discharging shall be as follows: Commencing from twenty-four (24) hours after arrival at or off discharging port whether steamer is in berth or not, cargo to be taken from alongside by the consignee named in the bill of lading at port of discharge as quickly as steamer can deliver, but in no case at less than 1,000 tons (of 2,240 pounds each) per running day, Sundays and legal holidays excepted, unless used."

"9. The liability of the party of the second part shall cease and terminate as soon as cargo is loaded and the freight is paid. Steamer to have a lien upon the cargo for all freight, dead freight and demurrage and all and every other sum or sums of money which may become due the steamer under this contract of affreightment. * * * * "

"13. The cargo to be received and delivered alongside the steamer, where she can load and discharge always safely afloat within reach of her tackles; wharfage and lighterage and also extra lighterage, if any, at the risk and expense of the cargo, any custom of the port to the contrary notwithstanding. * * * "

"15. Steamer to be discharged at such wharf as party of the second part or their agents may designate, where steamer may always safely lie afloat.

"16. * * * Steamer to pay all port charges and stevedoring expenses at port of loading and port of discharging."

The vessels loaded their cargo at Norfolk, Va., and then issued to Gano Moore Company, as shipper, bills of lading, on the printed form of that company, calling for delivery of the goods "unto order or assigns, he or they paying freight for the same as per charter party" (described by date), "all the terms and exceptions contained in which charter are herewith incorporated." The bills of lading were stamped "Freight Prepaid."

In order to pay for the coal the railway had opened letters of credit in New York with the First National Bank of Boston, and within 48 hours after each vessel had sailed Gano Moore Company delivered to the bank the bills of lading, indorsed in blank, charter, and other shipping documents, received from it the purchase price of the coal, and the bank thereupon transmitted these papers to the railway.

The vessels arrived at Buenos Aires Roads, where all vessels are required to come to anchor and receive quarantine inspection. That point is about 20 miles from the water front of the city. Originally the only port of Buenos Aires was the Roads.

The wharves and docks lie at two basins, the North Basin and the South Basin, and in the interior is a chain of, docks parallel to the water front connecting the two basins. From the North and South Basins channels have been dredged through the shoals, converging at a point about 5 miles off shore and continuing thence by a single channel to the Roads. The Roads are located in a depression in the River Plate about 140 miles from the sea, approximately half a mile wide and 3 miles long.

The port of Buenos Aires includes the Roads, entrance channels, and inner harbor, all of which are defined as the "ports of the capital and of La Plata" by the Ministry of Finance of the Argentine and are under the control of public authority as such. At the Roads the river pilot leaves the vessel and is succeeded by the harbor pilot, who takes the vessel through the channels to her berth. A vessel is not allowed to proceed to berth from the Roads until she is entered with the customs and a berth has been designated and a permit secured. The captain ordinarily goes ashore from the Roads to give his notices of arrival to the consignees of cargo and to enter the ship in the customs. Every movement of the vessel after it reaches the outer Roads is within the control of the Argentine Prefecture and after a permit has been granted for her berth she cannot go elsewhere without having that permit canceled and securing another (page 750). There is no anchorage allowed for large vessels between the Roads and the docks (page 652). The ships in this case were entered at the Buenos Aires customs and when berthing orders were received from the railway, permits issued from the port authorities.

The port of Buenos Aires has no regular tide, but there is an irregular rise and fall of the water, caused by the wind. When the wind blows from the south, it blows the water from the sea into the River Plate; the rivers Parana and Uruguay, running down, bring their waters against the water which is brought up by the wind from the sea, and thus cause the water to rise. When the prevailing winds are from the north, they blow the water out and increase the influence of the current from these two big rivers, and that causes low water in the estuary.

The railway designated the South Dock as the discharging place for all the vessels except the Kofuku Maru, and in her case named Wilson's Wharf, South Basin. All the vessels were delayed in getting to their berths by the shallow water in the channel, and two of them had to unload some of their cargo into lighters in order to reach the dock. There were also delays in discharging. The libelants claimed that the lay days began to run when they reached the Roads, and that from that day the consignee was required to take delivery of cargo at the agreed rate of 1,000 tons per running day, and that, calculated on that basis, a large amount of demurrage was due, as well as certain expenses for lightering and other disbursements, to which they were entitled. The owners of the Seifuku Maru and the Kofuku Maru also claimed demurrage at the loading port.

The railway company sought to recover indemnity from Gano Moore Company and Gano Moore Mining Company for demurrage at loading and discharging ports, and for any expenses for which it might be liable, on the ground that Gano Moore Company had agreed in its contracts with the railway to deliver the coal on land by sea carriage at a certain rate per ton, and to maintain an interval of 10 days between each steamer, and that all charges claimed in connection with the carriage arose from the breach by Gano Moore Company of that contract; furthermore, that the Gano Moore Mining Company was a mere dummy for Gano Moore Company, against which a decree to recover indemnity might be directly entered.

The trial judge allowed the claims of the libelant for demurrage at the loading port and for demurrage and expenses at the discharging port as against the railway. He also allowed demurrage at the loading port against Gano Moore Company in the case of the Kofuku Maru and the Seifuku Maru, but held that they were freed from demurrage at the discharging port by the cesser clause of the bills of lading. He also held that there was no maritime obligation as between the railway company and Gano Moore Company and Gano Moore Mining Company, except for loading demurrage on the part of Gano Moore Company. Such other facts as may be pertinent will be stated hereafter as the various questions relating to them arise.

The railway contends: (1) That it is not liable in personam for any damage claims; (2) that the vessels did not sustain any demurrage; (3) any delay that occurred was due to fault of libelants; (4) that it is entitled to indemnity for any liability it may be under from Gano Moore Company and its successor.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (John M. Woolsey, Edwin S. Murphy, and James H. Herbert, all of New York City, of counsel), for appellant.

Hunt, Hill & Betts, of New York City (George C. Sprague, of New York City, of counsel), for Suzuki & Co.

Burlingham, Veeder, Masten & Fearey, of New York City (John L. Galey, of New York City, of counsel), for. Holland-American Line and Green Star S. S. Co.

Carter & Phillips, of New York City (Robert Phillips, of New York City, of counsel), for Luckenbach S. S. Co.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge (after stating the facts as above). The libelants. are met at the threshold by the contention of the railway that the cesser clause of the charter parties, which were incorporated in the bills of lading, relieved it from liability. They say the Argentine law governs the liability, and that that law is evidenced by the decision of an Argentine Court of Appeal in the case of The Moncalieri, which was a. vessel chartered by Gano Moore under circumstances similar to those here. In that case the Argentine Railway was sued for demurrage by the owner of the Moncalieri, and the court held that the cesser clause implied an agreement to exclude all personal action against the charterer, *or his assignees,* and discharged the railway from liability.

The District Judge found in the present case that in Argentine the "Constitution and Codes constitute its laws, and that the decisions of its courts do not constitute any part of its law, and are not binding as precedents." He accordingly refused to follow the Moncalieri decision. It was in general said by the witnesses as to Argentine law that, in the absence of a cesser clause, the railway, as indorsee of the bill of lading, would have been liable for demurrage. Yet there was some discussion as to whether, even in that event, there was a lien which could be enforced at the port of Buenos Aires in the common-law sense by withholding delivery of cargo, and libelant's witness Dr. Edye said that there was not. But, if that was so, there was still a right of the shipowner or master under article 958 of the Commercial Code to embargo the goods after 30 days from the date of discharge, and under article 1083 to apply for a deposit of the goods by order of court subject to the right of the shipowner over them. The relinquishment of the cargo to the railway was ample consideration for an assumption of liability on its part (Crossman v. Burrill, 179 U. S. 100, 21 S. Ct. 38, 45 L. Ed. 106), aside from the fact that article 166 of the Commercial Code determined the matter in any event by the provision that: "The assignee, indorser or bearer of the bill of lading is subrogated to all the obligations and rights of the consignor."

But the railway relies on the cesser clause and says it discharged the charterer and therefore discharged it. There is a difficulty with this at the outset, which was apparently never considered, or even realized, by the Argentine court in the Moncalieri Case, for the charterer here was only discharged by the cesser clause as charterer, and was not discharged as consignor and owner of the goods, unless and until he parted with his title. A consignor, who was owner of the goods and holder of a bill of lading incorporating the conditions of the charter party, was held in Gullischen v. Stewart Bros., 13 Q. B. D. 317, to obtain no exemption from liability by reason of the cesser clause. The court there consisted of Coleridge, C. J., Brett, M. R., and Bowen, L. J. Brett, M. R., said:

"The contract by a bill of lading is different from a contract by a charter party, and the defendants are sued upon the contract contained in the bill of lading. It would be absurd to suppose that their liability upon the bills of lading would cease upon the loading of the cargo. What is their liability upon the bills of lading? It is to pay freight and other conditions 'as per charter party.' Upon the terms of the charter party the consignees were to pay demurrage at a certain rate; that is a condition which is incorporated in the bill of lading. But the clause as to the cesser of the charterers' liability is not incorporated."

Lord Bowen said:

"The bill of lading by its words incorporates the terms of the charter party; but these words must receive a reasonable construction. The result is that the bill of lading incorporates certain provisions of the charter party, but not the clause as to cesser of liability. The argument for the defendants would render the bill of lading a nullity; it would be a useless form except as an acknowledgment that the goods had been put on board."

To the same effect was the decision of Judge Putnam in The Eliza Lines (C. C.) 61 F. at pages 325, 326, who cites Carver,

MacLachlan, and Abbott as reaching the same conclusion. Scrutton on Charter Parties, art. 19, at page 67, 11th Ed., says: "But the cesser clause * * * will not be incorporated in the bill of lading." And Carver (6th Ed.) at page 227, says: "A cesser clause in the charter is not brought into the bill of lading, that being inconsistent with it." To the same effect is the dictum in Repetto v. Millar's Karriet, [1901] 2 K. B. at page 313.

[1] Now, when the Argentine court based its decision as to the cesser clause on the ground that it "implies an agreement to exclude all personal action against the charterer or his assignees with equal rights to those of the assignor," and there was no consideration of the fact that the consignors, Gano Moore Company, to whose rights alone the railway succeeded under the statutory provisions of article 166 of the Commercial Code, were never exempt from liability until after they had parted with title by indorsement of the bill of lading to the Boston bank as the railway's agent, how can it be said that the decision is of any weight? The decree in the Moncalieri Case stands alone in contradiction to the settled maritime law elsewhere. It is not a decision of a court whose opinions express in any controlling way the law of Argentine, for there are a number of divisional courts there of equal weight, all of which administer the civil law, and none of which is in any sense bound by judicial precedent. The mere fact that they naturally may be influenced by former decisions and may finally accept them, when their logic becomes persuasive, is not a reason for regarding a single decision that goes counter to universal maritime law as authoritative as to the law of Argentine, or as binding on other courts. No Circuit Court of Appeals in this country of precedents would feel obliged to follow another circuit in similar circumstances, or to follow the decision of a state court that was not supreme in interpreting state law.

[2] Judge Putnam discussed the origin of the cesser clause in The Eliza Lines, supra, and said that it was first introduced to relieve agents who appeared as such in charter parties and was afterwards extended to charterers who were in fact agents, whether they appeared so or not. The cesser clause is in terms for the benefit of the charterer, and only affects him, and it is settled in this country and in England that an indorsee of a bill of lading incorporating the charter provisions, who receives the goods, is liable for demurrage and for other sums which may become due under the provisions in the charter party. The liability of the consignee is said to be based on an implied promise arising from his acceptance of the goods under a bill of lading that embraces the provisions. Union Pacific R. R. Co. v. American Smelting & Refining Co. (C. C. A.) 202 F. 720. The American decisions as to the liability of the consignee are collected in Yone Sukuzi v. Central Argentine Ry. Co. (D. C.) 275 F. 54, and some of the English decisions are referred to in Gullischen v. Stewart Bros., 11 Q. B. D. 186, affirmed 13 Q. B. D. 317. The Eliza Lines, supra, also involved the liability of the consignee, irrespective of the cesser clause.

The interesting essay by Mr. Leopold Dor in Revue de Droit Maritime Compare, vol. 9, pp. 172–178, indicates that the maritime law of other countries is in accord with that of the United States and England in limiting the effect of the cesser clause to a personal exemption of the charterer, and in not incorporating it by reference in the bill of lading.

[3] But it is quite certain that the Argentine law does not apply to the case. The charter parties were all executed in this country, the bills of lading were issued here, naming Gano Moore Company as shipper and consigning the coal to order or assigns, the goods were loaded in the United States, paid for in New York by a Boston bank, with which the railway had opened a letter of credit, the bills of lading were indorsed over and delivered in New York to the bank as the railway's agent shortly after the ship sailed, and the title to the merchandise then became vested in the railway company. The charter parties were on the standard Washington coal form, and provided that the freighting was subject to the terms and exemptions of the Harter Act (46 USCA §§ 190–195), and that general average was to be settled according to the New Antwerp Rules of 1890, "and as to matters not therein provided for according to the law and usage of New York." Neither the charters nor bills of lading contain any reference to Argentine law. Such contracts were American contracts. Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 9 S. Ct. 469, 32 L. Ed. 788; The Majestic (C. C. A.) 60 F. 624, 23 L. R. A. 746; Fish v. D., L. & W. R. R. Co., 211 N. Y. 375, 105 N. E. 661; Fonseca v. Cunard S. S. Co., 153 Mass. 533, 27 N. E. 665, 12 L. R. A. 340, 25 Am. St. Rep. 660; O'Regan v. Cunard S. S. Co., 160 Mass. 336, 35 N. E. 1070, 39 Am. St. Rep. 484.

[4] It is contended on behalf of the railway company that it only became bound by an implied contract (arising upon acceptance of the goods in the Argentine) to pay according to the terms of a bill of lading issued to the consignor in America, and that, while the bill of lading did not incorporate the cesser clause under our laws, it did do so in the Argentine, where the liability of the railway came into being. But this seems an untenable view, for the implied contract was to perform the obligations of the existing contract of carriage that had been executed in America. By its terms the holder of the bill of lading agreed to pay demurrage, and by the American law the cesser clause was not incorporated in it. The railway stood precisely in the position of the consignors, if they had never transferred the bills of lading to the railway. To say that the implied contract, though based upon the terms of the bills of lading and arising through transfer thereof, embraces provisions of the charter party which were never incorporated in the bill of lading as between the parties thereto, would involve implications unwarranted by the facts and would take from the libelants all right to enforce their contracts. We therefore hold that the libelants were rightly adjudged entitled to recover any demurrage that occurred at the discharging port, unless it was occasioned by their fault or covered by some exception in the bill of lading.

[5] But does the same principle allow a recovery against the railway of demurrage caused by detention of the Seifuku Maru and the Kofuku Maru at the loading port? Clause 4 of the charter provides for the rate of loading and also says:

"Lay days for loading * * * to commence from time steamer is ready to load (or within 96 hours after readiness to load if delayed awaiting turn at berth) and master has given notice in writing of such readiness to the party of the second part or his agent. * * *"

Clause 9, containing the cesser, says:

"Steamer to have a lien upon the cargo for all freight, dead freight, and demurrage, and all and every other sum or sums of money which may become due the steamer under this contract of affreightment."

It would certainly seem that clause 9, supra, gave a lien for demurrage at the loading port, whether under the words "all * * * demurrage," or the words "all and every other sum that may be due the steamer" following. It is hard to see what else can

27 F.(2d)—51

have been intended when clause 4 defined lay days at the loading port, and clause 9 went on to give the steamer a lien for all sorts of sums due the steamer, in the most sweeping terms.

Judge Learned Hand discussed this very question on exceptions to the original answer to the libels of the owner of these vessels in Yone Suzuki v. Central Argentine Ry. Co. (D. C.) 275 F. 54. He held the claim for loading port demurrage good, and relied on Gray v. Carr, L. R. 6 Q. B. 522, and that case is still regarded as the only one directly in point. It allowed loading demurrage under a clause in a charter party which provided that the owners were "to have an absolute lien on the cargo for all freight, demurrage, and average; and the charterer's responsibility to cease on shipment of the cargo, provided it be of sufficient value to cover the freight and charges on arrival at port of discharge." The suit was against the consignee for demurrage at loading port. The bill of lading made the goods deliverable "unto order or to his or their assigns, he or they paying freight and all other conditions or demurrage (if any should be incurred) for the said goods as per the aforesaid charter party." In that charter there was no provision like the one here for demurrage at the discharging port, but only a provision to pay for "ten days on demurrage at the port of loading," so that the words referring to demurrage would have had to be given no effect at all, if they had not been taken to embrace demurrage at the loading port. Here the charter party provided for demurrage for *both loading and discharging* and also used words calculated to create a lien for demurrage at both places. In Serraino v. Campbell, [1891] 1 Q. B. 283, Gray v. Carr was referred to as undoubted law and treated as holding that the bill of lading embraced such clauses of the charter as were to be performed by the receiver of the goods. In Serraino v. Campbell the bill of lading was held not to include exceptions from liability in the charter which were not specifically mentioned in the bill of lading, and were of a different kind from the obligation which the owner of the bill of lading was to pay or perform.

We can see no escape from the conclusion that loading demurrage was given by the charter parties of the two vessels in question and was commensurate with the lien. The Marpesia (C. C. A.) 292 F. 957, and Elvers v. Grace & Co. (C. C. A.) 244 F. 705, did not hold that the consignee was not

liable for loading port demurrage, but only that the cesser clause would not operate to relieve the *charterer* as to obligations which arose before the merchandise was put on board. See, also Christoffersen v. Hansen, L. R. 7 Q. B. 509, to the same effect.

The contention that the railway cannot be held liable, because loading demurrage was not *noted* in the bill of lading, is not sound. The bill of lading incorporated the charter party, and hence all obligations to be performed by the receiver of the goods, including payment of such demurrage. The situation is very different from a case like Watt v. Cargo of Lumber (C. C. A.) 161 F. 104, where the master was asked to give a clean bill of lading and a claim for demurrage at the loading port had accrued. There was no reference there to a charter party containing provisions for loading demurrage.

[6] The most important contest is over the demurrage at the discharging port, for it affects all the vessels and represents by far the largest claims. It is said that the clause of the charter whereby the shipowners agreed "to freight on the said steamer * * * to Buenos Aires or as near thereunto as she may safely get and always lie afloat and there deliver a full and complete cargo" is controlling, and that though clause 5 prescribed lay days for discharging as "commencing from twenty-four (24) hours after arrival at or off discharging port whether steamer is in berth or not," the effect of the two clauses was to require the vessels to reach their designated wharves before the lay days would begin. This argument is further pressed because clause 4 prescribed that lay days for *loading* should commence from a certain number of hours "after steamer is ready to load."

But we agree with the District Court that the clause as to lay days for discharging cannot be explained in any such way. The time when lay days for discharging are to commence is clearly stated to be the time when the vessel is "at or off discharging port whether vessel is in berth or not." The difference in the language from that governing lay days for loading was doubtless intended to give vessels the benefit of delays in reaching berth in calculating demurrage. Vessels at the time were in enormous demand and could exact charter provisions strongly in their favor. Lay days do not necessarily begin when a ship is at or off her berth, but their beginning depends on the terms of the charter provisions. The port is ordinarily the place where the port authorities are exercising jurisdiction. Such a place was Buenos Aires Roads. Sailing Ship Garston Company v. Hickie, [1884] 15 Q. B. D. 580. As the District Judge said:

"No vessel can proceed beyond the roads without a permit. No permit is granted till an immediately available berth is designated. There is no stopping place between the roads and berths under ordinary circumstances. The roads are the place where vessels waiting for a berth usually lie. The time when the vessels arrived at the roads, therefore, must determine the beginning of lay days unless it was intended that they should not begin until after a vessel was actually in or at least off its berth."

The old Welsh form of coal charter, which had been used in the coal trade with Buenos Aires, provided that lay days at the discharging port should begin when the steamer is "ready to unload and written notice given, whether in berth or not." The Washington form of charter adopted by the Shipping Board was new and different, and plainly placed on the charterer and consignee the hazards of delay at the terminus of the voyage, which had theretofore been borne by the ship.

We think that such explicit language as "at or off" the "discharging port" made Buenos Aires Roads the place where the lay days began to run. The distance from the docks is not so extraordinarily great, and little, if any, greater than the distance from quarantine in New York Harbor to some of the uptown docks.

It is also significant that in one of the original answers it was admitted that the vessel "arrived at Buenos Aires Roads, which is at or off the port of Buenos Aires." See, also, answer in case of Sifuku Maru (folio 69).

The provisions of the charter are clear. As was said by Atkin, L. J., in Van Nievelt, Coudrian & Co. v. Forslind, 30 Com. Cas. at page 268: "You do not necessarily determine the provisions as to the amount of demurrage merely by considering what point the ship should proceed to, whether to a port, a dock, or a berth, though that matter is a matter which no doubt has to be considered. * * *" And as this court said in The Skomvaer, 297 F. 746: "When the parties to the contract have explicitly and without any reservation or proviso provided when the lay days shall begin, the express written agreement controls." Such a case was The Edward T. Stotesbury (C. C. A.) 187 F. 111.

In Owners of Borg v. Darwen Paper Co., 8 Lloyd's List Law Reports, 49 (1921), the

Court of King's Bench held that "at or off the port" did not mean arrival at the dock, and that those words fixed the time from which the vessel should be discharged at the rate of 400 tons per working day. The court, in holding that the 24-hour period began to run with the arrival of the ship at night off the port, said: "But, dock or no dock, the beginning of the discharge is to be reckoned from the time the ship arrived at or off the port, and I do not see how this letter affects it at all." (The letter was a notification that the vessel had reached her dock.)

[7] Even if "readiness to discharge," and not arrival "at or off" the port, were the test of the beginning of the lay days, those days would begin when the vessel arrived at the port, and not when she arrived at or just off her berth. Such was the rule laid down by Judge Ward in The Edward T. Stotesbury, supra, who said:

"When * * * the charterer is to name the berth, he should be ready to receive the cargo when the vessel is ready to deliver, even if she cannot do so, either because he has not named the berth, or because he has named a berth to which she cannot get, or to which she is prevented from getting through no fault of hers." Carbon Slate Co. v. Ennis (C. C. A.) 114 F. 260; Roney v. Talbot & Co. (C. C. A.) 161 F. 309; The Lake Yelverton (C. C. A.) 300 F. 47; Pyman Bros. v. Dreyfus Bros. & Co., 24 Q. B. D. 152.

Even a case that goes as far as Tharsis v. Morel, [1891] 2 Q. B. 647, does not apply to a charter party which provides that lay days shall begin 24 hours after arrival *"whether steamer is in berth or not."* W. K. Niver Coal Co. v. Cheronea S. S. Co. (C. C. A.) 142 F. 402, 5 L. R. A. (N. S.) 126; Northfield S. S. Co. v. Compagnie L'Union des Gaz, [1911] 1 K. B. 434. In such cases the lay days begin when the vessel is in port, and not when at her berth.

The cases relied upon by the railway have not dealt with clauses fixing the time from which the lay days were to be calculated like those here. It is true that, where the parties have named a particular berth for discharge, and also in England where the charterer is to name the berth, demurrage will not run until the vessel is at her berth and ready to discharge, unless there is some controlling provision which fixes an earlier date. But the solution of the problem always depends on the exact expression of the particular charter party. We have been referred to no decision that the lay days would not run until the vessel reached her berth, where they were to commence, as here, "after arrival at or off discharging port, whether steamer is in berth or not."

Furthermore, as the trial judge said: "The provision making it possible for lay days to begin 24 hours after arrival off the discharging port and the provision that the cargo is to be taken from alongside at port of discharge preclude the contention that the ship must be ready to discharge before lay days can commence." We regard clause 5 as determining the time when demurrage began.

[8] It is contended, in the case of The Plymouth, that an accord and satisfaction was had which deprived her owner, the Green Star Steamship Company, of the right to claim any demurrage. The Plymouth was so delayed in discharging that she feared the loss of another charter, and accordingly arranged to pay the railway for 93 tons of coal still undischarged, so that she could sail. This payment was made and the Plymouth left. It is said that the transaction involved the release of all claims of the Green Star Steamship Company (including demurrage) against the railway. The matter was handled by Dr. Araya, a lawyer representing the vessel, who dealt with Dr. Frias, the president of the local committee of the railway company. Frias alone testified as to the conversations and admitted that Araya did not claim there were "demurrage and other expenses due" (folio 3638). There seems to have been no satisfactory evidence of an agreement to release claims for demurrage. The only writing referring to the matter is the bill of Araya for legal services to the steamship agent, Van Bokkelen, which mentions conference "to settle demurrage" (folio 5427). The item occurs at the end of the bill, after items relating to transactions which occurred after the Plymouth had left Buenos Aires. There was no proof of authority on the part of Araya to release the claim, and no sufficient proof that he attempted to do this. The District Court was right in not sustaining this defense.

[9] It is further contended by the railway that the strike exceptions justify deductions from the lay time in the case of The Edenton and The Plymouth. But the strike exception in clause 4 is directed only to time lost through strikes at docks which *"prevent * * * taking cargo,"* while clause 5, with respect to lay days at the discharging port, contains no strike exceptions, and provides that the vessel shall discharge "as quickly as steamer can deliver, but in no case less than 1,000 tons per running day." If strikes

had been intended to stop the running of the lay days in respect to discharging cargo, clause 5 would naturally have contained some provision like that in clause 4. The libelants, therefore, seek to resort to the general exception in clause 3 as to restraint of princes, accidents, riots, and strikes; but that exception cannot be regarded as applying to the running of the lay days which, as we have already stated, began by the express agreement of the parties when the vessel was "at or off" the port of Buenos Aires.

Demurrage is extended freight, and the strike exception, like that of restraint of princes, does not stop it from running. Clyde Commercial S. S. Co. v. West India S. S. Co. (C. C. A.) 169 F. 275. There is an absolute contract to pay demurrage, and payment is not prevented by strikes. Moreover, the strike was in progress at the South Dock from the time these vessels arrived, and the railway should have exercised its option to name a different berth, and should have sent them somewhere else, if the strike would cause a delay. Its neglect ought not to prevent demurrage from running. The strike was not general, and other vessels were discharging at the South Basin and North Basin. Evans v. Blair (C. C. A.) 114 F. 618; The Manta (C. C. A.) 13 F.(2d) 535; The Edward T. Stotesbury (C. C. A.) 187 F. 111.

[10] The question, then, comes down to the calculation of the demurrage at the discharging port. The railway has contended that it should not be computed at the minimum rate of discharge of 1,000 tons per day, in spite of the admissions in the amended answers, under which the calculations seem to have been made upon that basis. It says that the words "as quickly as steamer can deliver" so limit the following words of the clause, "but in no case at less than 1,000 * * * tons per running day," that there is no fixed rate of demurrage, and in support of this it cites Dobell v. Watts, [1891] 7 T. L. R. 426. In Dobell v. Watts, the charter provided:

"Cargo to be furnished and received by ship at port of loading as fast as vessel can receive it in ordinary working hours, and to be received from alongside ship at port of discharge as customary as fast as steamer can deliver in ordinary working hours, Sundays always excepted loading or discharging. Not less than 100 standards a day loading or discharging, and ten days on demurrage over and above the said laying days at £70 per day."

There were no words in the foregoing charter provision definitely requiring the charterers to take cargo at the rate of 100 standards per day. The court held that this stipulation as to 100 standards was for the protection of the charterers, and did not amount to an undertaking by them that the ship should be discharged at that rate, but that their only obligation under the above-quoted clause was to receive cargo with reasonable diligence. Hulthen v. Stewart & Co. [1903] A. C. 389; Empire Transportation Co. v. Philadelphia & R. C. & I. Co. (C. C. A.) 77 F. 919, 35 L. R. A. 623.

But the charter in the present case provided that cargo was "to be taken from alongside by the consignee * * * at the port of discharge as quickly as steamer can deliver, but in no case at less than * * * 1,000 tons * * * per running day." These words inevitably obliged the consignee to receive cargo at a fixed rate. Such was held to be the proper construction of a similar clause in The Corvus (D. C.) 282 F. at page 941, where Judge Rose distinguished Dobell v. Watts, and his decision was affirmed by the Circuit Court of Appeals for the Fourth Circuit at 288 F. 973. The Skomvaer (C. C. A.) 297 F. 746; Yeoman v. Rex, [1904] 2 K. B. 429.

The railway emphasizes the words "to be taken * * * by the consignee * * * as quickly as steamer can deliver," in order to escape the requirement that it should take at a fixed rate, but in doing this it overlooks the succeeding words, "but in no case at less than * * * 1,000 tons * * * per running day." They can have but one meaning.

[11] The District Court found that the steamers had the equipment to make delivery of the cargo at Buenos Aires and were guilty of no fault or neglect in making deliveries. The burden was on the consignee to prove that any delay which occurred was due to the fault of the ships, if it wished to establish such a defense to its agreement to pay demurrage. The Hans Maersk (C. C. A.) 266 F. 806; The Skomvaer (C. C. A.) 297 F. 746. No delay due to the inability of the steamers to secure stevedores because of strikes, or to any other cause not attributable to their neglect, would afford any defense to the railway. Such delay as occurred at the docks seems to have been because the railway failed to provide cars sufficient to deal with the number of vessels it had to unload, and also because some of the vessels could not be discharged at the railway's regular dock at the South Basin, where it had the better facilities.

[12] The contention that the vessels, in spite of the conditions of low water and the judgment of experienced pilots, who under the harbor regulations controlled the situation, could have proceeded to their berths without delaying in the roads, not only is met by all the probabilities, but is without legal basis. As was said in William Alexander & Sons v. Aktieselskabet, etc., [1920] A. C. at page 93, where Viscount Finlay quoted with approval the court below:

"It is well settled that where a merchant has undertaken to discharge a ship within a fixed number of days he is liable in demurrage for any delay of the ship beyond that period unless such delay is attributable to the fault of the shipowner or those for whom he is responsible. The risk of delay from causes for which neither of the contracting parties is responsible is with the merchant."

See, also, The Marpesia (C. C. A.) 292 F. 957; also Scrutton on Charter Parties (12th Ed.) art. 131, p. 356.

[13] The trial judge held that the railway was liable for incidental expenses for labor, overtime, and lighters. Some of these items were claimed on the theory that demurrage was lessened and damages were mitigated by expediting the discharge. In answer to these claims, it is said that no duty or right to minimize damages existed when no breach of the contract of carriage or of the agreement to pay demurrage had occurred, and that demurrage is essentially extended freight, and not damages for breach of the charter party. But we recently said in New York & Cuba Mail S. S. Co. v. Lamborn (C. C. A.) 13 F. (2d) 535:

"It does not appear to us to make the slightest difference whether a charter party * * * be regarded as imposing an obligation upon the charterer to load or discharge within the lay days, the demurrage being stipulated damages, or whether the delay be regarded as the charterer's privilege, and the demurrage as hire during the extended period. * * * The owner's duty to minimize the loss may exist equally, though the charterer does not break any promise in failing to load, because the owner in any event recovers upon the promise to pay demurrage, and there is no more reason why his damages on that breach should not be subject to the ordinary rules than if he were suing on the breach of a promise to load. True, when the question arises, the charterer has not yet broken his promise to pay the demurrage, but the loss is inevitable, and the duty of the promisee to reduce it before the time of formal breach ought to depend upon the same principles as afterwards. In neither case does the law impose a promise on the promisee which he has not undertaken, but in each it controls the remedy, so that he may not recover, even for actual losses which he might reasonably have avoided." U. S. v. Sugarland Industries (C. C. A.) 296 F. 913; Dahl v. Nelson, 13 App. Cases 38.

The court below properly allowed various items of expenditures, irrespective of whether a breach of contract existed at the time they were incurred, to the extent that they "were reasonably incurred and were not more than the demurrage saved thereby."

The expenditures claimed are: (1) Lighter hire, demurrage on lighters, and stevedores' expenses in discharging from lighters to docks. (2) Extra expenses of overtime stevedoring on Sundays and holidays. (3) Expenses of shore cranes and shore capstans at night, used in placing cargo in wagons and shifting wagons, and overtime labor for operating. (4) Extra expense of discharging at night and at meal hours.

Clause 13 of the charter provides cargo is "to be received and delivered alongside the steamer, where she can load and discharge always safely afloat, within reach of her tackles; wharfage and lighterage and also extra lighterage, if any, at the risk and expense of the cargo."

The Seifuku Maru and the Yseldijk had to be lightered to reach their berths, and the Plymouth had to engage lighters because she could not lie alongside her dock, owing to insufficient water, and because there were not wagons enough furnished by the railway for her prompt discharge. Lighterage expenses were therefore covered by clause 13, supra, and were properly allowed.

Extra expenses for overtime stevedoring on Sundays and holidays was a valid claim, under clause 7 of the charter. We understand that this item is not disputed, and hold that it was properly allowed.

The expense of shore cranes and shore capstans, and extra expense during overtime for operating them, were manifestly charges against the cargo, and not the ship, for the latter was only bound under clause 13 to deliver within reach of her tackles. Petersen v. Freebody & Co., [1895] 2 Q. B. 294; Petition of L. Boyer's Sons Co. (C. C. A.) 25 F. (2d) 602. The cranes were needed for placing the coal on the wagons, which the ship's tackles were unable to reach, and the capstans to pull the wagons along the dock. The expenses during the day seem to have been properly paid by the railway, and the charge was only for overtime. The custom

of using cranes and capstans *ashore* can have no bearing on the claim of the steamers, for clause 13 is specific in limiting their obligation to delivery within reach of their tackles, and it, moreover, concludes with the words "any custom of the port to the contrary notwithstanding." Palgrave Brown & Son v. S. S. Turid, [1922] 1 A. C. 397.

The extra expenses of Seifuku Maru, Yseldijk, and Plymouth for discharging at night stand upon a similar footing to the items for overtime and use of shore cranes and capstans, though they are more doubtful, because of the general obligation of the steamer to pay expenses of discharging. Clause 7 provides that expenses of overtime Sundays and holidays shall be for account of consignee. This specific exception to the general liability imposed on the steamer by clause 16 is said to preclude any other charges against the vessels for overtime of stevedores.

[14] The railway also contends that the vessels were bound to discharge both night and day, and that the extra expense was for that reason not recoverable. This conclusion it deduces from the provision in clause 5 that cargo is to be taken by the consignee "as quickly as steamer can deliver, but in no case at less than 1,000 tons * * * per running day." A "running day," it says, is "every day, day and night." Neilsen v. Wait & Co., 16 Q. B. D. 67. From all this it argues that the shipowner agreed to discharge his vessel by the running day, and bear the cost of discharging. But it is hard to see how any such obligation arises from the mere provision that lay days for discharging shall be calculated at the rate of "1,000 tons * * * per running day."

We can discover no provision requiring the steamers to discharge continuously day and night, and such an interpretation of the charter parties is not at all in accord with the decisions. Creighton v. Dilks (D. C.) 49 F. 107; Tweedie Trading Co. v. Pitch Pine Lumber Co. (D. C.) 156 F. 88; Maid of Psara, 1926 A. M. C. 1256.

While the vessels were liable for all regular stevedoring expenses, except those resulting in overtime charges for Sundays and holidays, yet, if demurrage became inevitable, and they could avoid greater loss by discharging overtime on other days, they were, as the trial judge said, entitled to recover such extra expenses, "to the extent that the same were reasonably incurred, and were not more than the demurrage saved thereby."

[15] We come finally to a consideration of the liability of Gano Moore Company and Gano Moore Coal-Mining Company, Inc. Gano Moore Company was the charterer of all the ships, and was directly liable to the shipowners for all demurrage and incidental expenses, except so far as it might be released by the cesser clauses of the contracts of carriage. We have already cited The Marpesia (C. C. A.) 292 F. 957, Elvers v. Grace & Co. (C. C. A.) 244 F. 705, and Christoffersen v. Hansen, L. R. 7 Q. B. Cas. 509, as holding that the cesser clause did not affect the liability of the charterer for obligations which arose before the goods were put on board and the bills of lading were signed. Under these authorities, Gano Moore Company is liable for the loading port demurrage of the Seifuku Maru and the Kofuku Maru. But by the cesser clause the charterer is relieved from all liability for demurrage and incidental expenses after the goods were placed on board, because as to these items the vessels had liens commensurate with the scope of the clause. While the railway, as recipient of the cargo, was properly held liable for the loading port demurrage, the charterer Gano Moore Company still remained liable by reason of its contract with the shipowner, and as between it and the latter it was primarily liable, because the delay at the loading port was due to its fault. The decree should accordingly provide that the liability of the railway for loading demurrage shall be secondary.

It is contended that Gano Moore Coal-Mining Company, Inc., ought to be held directly liable for the obligations of Gano Moore Company. Courts of admiralty have held corporations which owned and controlled others liable for the latter's acts. Luckenbach S. S. Co. v. W. R. Grace & Co. (C. C. A.) 267 F. 676; The William Van Driel, Sr. (C. C. A.) 252 F. 35. This was because the controlled companies were mere dummies or agents. But Gano Moore Coal-Mining Company was not acting as agent or dummy for Gano Moore Company when the claim for port demurrage arose. The former company did not then even exist, and no liability based on agency or any kind of representation can be worked out.

[16, 17] It seems pretty apparent from the evidence that the stockholders of Gano Moore Company divided all its quick assets and then incorporated Gano Moore Coal-Mining Company, Inc., for the purpose of succeeding to the good will of the former company and embarking on a stock-jobbing career. In addition to its other activities, it did a busi-

ness of buying and selling coal like the original company. But no liability for the debts of Gano Moore Company can be worked out that is not based on property received from the former, and that property, so far as disclosed, was largely, if not entirely, good will. The liability of Gano Moore Coal-Mining Company must depend upon the extent of the value, if any, of the property transferred to it. Okmulgee Window Glass Co. v. Frink (C. C. A.) 260 F. 159. We are referred to no case where a remedy to reach and apply assets, ordinarily afforded only by a creditors' bill, has been applied by a court of admiralty. It seems quite foreign to its jurisdiction, and we hold that such relief cannot properly be granted in this suit.

[18] The railway further seeks to recover indemnity from Gano Moore Company on the ground that it has proved preliminary contracts with the latter whereby Gano Moore Company agreed (1) to sell and deliver to it 25,000 tons of coal, and that "the daily discharge will be 1,000 tons on land"; (2) to sell to it a further 25,000 tons of coal, "the discharge to be made on land," and "the shipment [to be] * * * effected by steamers during February/March, 1920, it being understood that there will be an interval of ten (10) days at least between each steamer."

The coal which the five vessels involved in this case carried was the coal sold by Gano Moore Company to the railway under the foregoing contracts. But those contracts were merely for the sale and delivery of coal on land, and were not maritime obligations.

The railway contends that Gano Moore Company occasioned the congestion and consequent demurrage at the discharging port by failing to keep their agreement to maintain an interval of 10 days between each steamer. It also insists that Gano Moore Company is under obligation to indemnify it for any sums found to be due libelants for demurrage and incidental expenses, because they contracted to deliver the coal in Buenos Aires "on land." But the agreements to maintain an interval of 10 days between each steamer and to deliver the coal on land were nonmaritime, and cannot be enforced in admiralty, either directly or by remedy over under the fifty-sixth rule. The Alert (Soderberg v. Atlantic Lighterage Corp.) (C. C. A.) 19 F.(2d) 286; The Ada (C. C. A.) 250 F. 194.

The interlocutory decree should be modified, so as to hold Gano Moore Company primarily liable for loading port demurrage, as between it and the railway company, and is otherwise affirmed.